UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VICKI BARBERA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:16-cv-2533-JMS-DML |
| | ) | |
| PEARSON EDUCATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Vicki Barbera, who is female, worked for Defendant Pearson Education, Inc.

("Pearson"), an education publishing company, for 27 years.  During her tenure, Ms. Barbera

worked in a variety of roles, most recently as a Manager of Business Analysis.  In January 2016,

Pearson announced that 700 warehouse employees – including Ms. Barbera – would no longer be

employed by Pearson but would, instead, be employed by R.R. Donnelley & Sons Company ("R.R.

Donnelley").  After Ms. Barbera declined to accept a job offer from R.R. Donnelley, she brought

this lawsuit against Pearson alleging sex discrimination and a violation of the Equal Pay Act.  Pear-

son moved for summary judgment, [Filing No. 50], and that motion is now ripe for the Court's

review.  In addition, Ms. Barbera filed an Objection to the Magistrate Judge's Order on Plaintiff's

Motion for Sanctions, [Filing No. 66], which the Court will also consider herein.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### EVIDENTIARY MATTERS

Before setting forth the facts in this case, the Court will first consider Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions. [Filing No. 66 (objecting to Filing No. 62).]

On November 22, 2017, the Magistrate Judge assigned to this case issued an Order on Plaintiff's Motion for Sanctions. [Filing No. 62 (granting in part and denying in part Filing No. 48)]. The main point of contention concerned an email Ms. Barbera alleges she sent to Michael Nathanson, Pearson's Senior Vice President of Distribution, in January 2016. [Filing No. 62 at 3.] During discovery, Pearson did not produce Ms. Barbera's email exchange with Mr. Nathanson. [Filing No. 62 at 5.] The Magistate Judge found that "[t]he record before the court shows that Pearson should reasonably have anticipated litigation involving Ms. Barbera and the denial of severance pay some time in February 2016," [Filing No. 62 at 5], and that "[w]hile Pearson gives plausible reasons why the email exchange might not have been available to it even with the best litigation hold protocol, it has not described the actual protocol it followed," [Filing No. 62 at 10]. Accordingly, the Court determined that a remedy should be afforded to Ms. Barbera. However, the Court found that Pearson did not act with the intent to deprive Ms. Barbera of the information

and, therefore, declined to impose sanctions pursuant to Fed. R. Civ. P. 37(e)(2). Instead, the Court held that any prejudice could be cured by requiring that certain facts about the contents of the email exchange be taken as true, specifically paragraphs 1-6 of Ms. Barbera's proposed stipulations of fact, at Filing No. 49-1. [Filing No. 62 at 13.]

On December 4, 2017, Ms. Barbera filed an Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, arguing that the Order is "clearly erroneous or is contrary to law" under Fed. R. Civ. P. 72(a). [Filing No. 66 at 1.] Ms. Barbera contends that the Court's holding hinges on its finding that Ms. Barbera "did not print the email exchange and give it to her lawyer" while she remained employed with Pearson. [Filing No. 66 at 2.] She alleges that this finding "improperly shifts the burden of preservation away from the employer" and ignores the fact that Ms. Barbera had signed a confidentiality agreement with Pearson that prevented her from printing a hard copy. [Filing No. 66 at 2-3.] As such, Ms. Barbera argues that the Magistrate Judge's finding should be set aside, that the jury should be instructed to take as true all paragraphs of Ms. Barbera's proposed stipulations of fact, and that the Court should consider additional sanctions under Rule 37(e)(2) for Pearson's destruction of her entire email account. [Filing No. 66 at 8.]

Pearson responds by contending that the Magistrate Judge's Order is not clearly erroneous because Ms. Barbera "has no evidence showing Pearson destroyed any evidence – including the subject email exchange – in bad faith or with the intent to deprive her of its use in litigation." [Filing No. 68 at 3.] Pearson additionally argues that this Court may not consider the contents of the confidentiality agreement because Ms. Barbera did not submit it in her original motion for sanctions. [Filing No. 68 at 3.] Even if the Court did consider the substance of the confidentiality agreement, Pearson argues that the email does not fall within its ambit because it reveals no confidential information. [Filing No. 68 at 5.]

- 4 -

In her reply brief, Ms. Barbera reiterates her argument that the Magistrate Judge's decision was clearly erroneous because it would "inappropriately shift the burden to the employee plaintiff, in virtually *every* employment case, to predict which emails will be most important to her case (without the benefit of discovery), and print a hard copy to ensure their use in litigation." [Filing No. 69 at 5 (emphasis in original).] In addition, Ms. Barbera urges the Court to issue harsher sanctions under Rule 37 because the Magistrate Judge's decision "failed to address the destruction of Plaintiff's entire email account." [Filing No. 69 at 5-8.]

Fed. R. Civ. P. 72(a) provides that a district judge must consider timely objections and modify or set aside any part of a magistrate judge's order that is "clearly erroneous or is contrary to law." Clear error means that the district court may overturn a magistrate judge's ruling "only if the court is left with the definite and firm conviction that the magistrate judge made a mistake." *Pain Ctr. of SE Indiana, LLC v. Origin Healthcare Sols., LLC*, WL 6674745, at *2 (S.D. Ind. Nov. 25, 2014) (citing *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997)). This is an "extremely deferential standard" and the district court "may not reverse the magistrate judge's decision simply because the district court judge would have come to a different conclusion." *McGuire v. Carrier Corp.*, 2010 WL 231099, at *1 (S.D. Ind. Jan. 13, 2010) (citing *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006)).

In this case, the Court is not left with the definite and firm conviction that the Magistrate Judge made a mistake in finding no evidence that Pearson acted in bad faith or with the intent to deprive Ms. Barbera of use of the email in litigation. With regard to the confidentiality agreement, Pearson is correct in pointing out that it is impermissible for the Court to consider evidence submitted for the first time in an objection to a magistrate judge's ruling. *See Pain Ctr.*, 2014 WL

6674745, at *2 (disregarding new evidence because defendants' assertion of such facts in an objection to a magistrate judge's ruling was "simply too late"). However, setting aside the issue of whether the confidentiality agreement barred Ms. Barbera from retaining the email in question, Ms. Barbera has not identified and the Court has not found any evidence showing bad faith or intent to deprive. Accordingly, Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, [Filing No. 66], is **OVERRULED**. For the purposes of considering Pearson's Motion for Summary Judgment, the Court will accept as true the facts set forth in paragraphs 1-6 of Ms. Barbera's proposed stipulations of fact. [Filing No. 49-1.]

### III.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed in Part I. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

Pearson is an education publishing and assessment company that provides educational products to pre-K-12 education, higher education, and professional customers. [Filing No. 50-3 at 2.]

During all times relevant to Ms. Barbera's case, the following individuals were employed by Pearson: Deborah Freeman, also known as Debbie Lindsay, was the Director of Human Resources, [Filing No. 51 at 23-24]; Michael Nathanson was the Senior Vice President of Distribution, Customer Services, and Transportation, [Filing No. 50-5 at 2]; Michael Scheuring was the Director of Inventory, [Filing No. 50-3 at 2]; and Laura Dwyer served as a Manager of Business Analysis at Pearson's Cranbury facility, [Filing No. 51 at 15]. Meanwhile, Andrew Wallace was

in charge of the programming staff and Mike Nicholson was in charge of networking, with neither having responsibility for a specific facility. [Filing No. 51 at 15.]

Ms. Barbera began working for Pearson in 1989. [Filing No. 51 at 6.] She is a graduate of North Texas State University, now known as the University of North Texas, where she earned a Bachelor's degree in Music, and Indiana University, where she earned a Master's of Business Administration in finance. [Filing No. 51 at 4.] She describes herself as a Mensan, [Filing No. 51 at 6], and prior to becoming employed by Pearson, Ms. Barbera was employed by Eli Lilly and the First National Bank of Chicago, and worked on a temporary basis, [Filing No. 51 at 5].

Ms. Barbera was initially hired by Pearson as a Business Manager. [Filing No. 51 at 6.] Her subsequent roles at Pearson include Manager of Production Control, Project Lead, Business Manager of Business Systems, [Filing No. 51 at 7], and Manager of Distribution Systems. [Filing No. 51 at 9]. At all times relevant to her case, Ms. Barbera served as Manager of Business Analysis at Pearson's Indy North facility. [Filing No. 51 at 15.][1]

## A. Pearson Severance Policies and Voluntary Separation Plans

On April 1, 2007, Pearson issued a severance policy (the "Severance Policy") that applied to all full time employees. [Filing No. 50-4 at 6.] The Severance Policy was subsequently revised on November 1, 2013,[2] and provided as follows:

---

[1] In her deposition, Ms. Barbera testified that titles were "thrown around loosely" at Pearson but that she would not refute that her title in 2015 and 2016 was "Manager of Business Analysis." [Filing No. 51 at 9.] Accordingly, this is the title the Court will use.

[2] On January 1, 2015, Pearson issued a revision to the 2013 policy, which was identical in all material respects to the two portions of the 2013 policy cited herein. [Filing No. 50-4 at 12; Filing No. 50-4 at 17.] As such, the Court will merely refer to the "Severance Policy," with the understanding that it is referring to the appropriate policy for the period of time discussed.

> Only regular full-time and short-hour Pearson Education and NCS Pearson employees whose employment is involuntarily terminated for reasons other than cause (as defined below) are eligible to receive severance pay. Employees who leave the company voluntarily, or who are discharged for cause, will not be eligible for severance pay. Term of project, part-time, temporary, seasonal, per diem workers, freelancers, consultants and independent contractors, are not eligible to receive severance pay.

[Filing No. 50-4 at 6.]  In addition, the Severance Policy provided that:

> ### Severance as a Result of Merger/Acquisition
>
> Notwithstanding any other provision of this Policy, no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger, consolidation, liquidation, dissolution or any other transaction when such employee is offered employment by the purchaser or another employer in connection with the transaction, regardless of whether the position offered is comparable to the employee's current position or is accepted by the employee.

[Filing No. 50-4 at 11.]

In or around 2013, Pearson began to reduce the size and scope of its warehouses in order to transition from the print business to digital products.  [Filing No. 50-4 at 3.]  To that end, Pearson issued a Voluntary Separation Plan on July 8, 2013 (the "2013 VSP") in order to reduce the number of management positions by offering "financial incentives for eligible employees to voluntarily separate from service with the company."  [Filing No. 50-4 at 18.]  The 2013 VSP was not offered to employees who submitted notice of their resignation prior to the effective date, or to employees who worked in the finance or systems departments.  [Filing No. 50-4 at 18.]  The 2013 VSP provided for the following plan benefit:

- Lump Sum Payment 2 weeks of pay for every full year of service to the company (max. of 26 weeks)Additional month of pay (transition bonus) as an incentive to participate and defray retraining costs
- For eligible employees, pro-rated incentive pay for 2013
- Pro-rated 2013 vacation

[Filing No. 50-4 at 19.]  In order to take advantage of the 2013 VSP, employees were required to notify Debbie Freeman prior to August 19, 2013.  [Filing No. 50-4 at 19.]

The next year, Pearson announced that its Indy North and Lebanon distribution centers would be consolidated, and the company again offered a Voluntary Severance Program and Attendance Bonus (the "2014 VSP"). [Filing No. 50-4 at 23.] The 2014 VSP provided that salary and benefits continuation would be determined in accordance with the Severance Policy and stated that the systems and transportation departments were ineligible to participate in the program. [Filing No. 50-4 at 23.] In order to opt in, the 2014 VSP provided as follows:

> Eligible employees interested in the plan must complete the attached form and return it to the Human Resources Department during the election period. The election period begins 2/17/14 and ends 2/28/14. Applications received after the 2/28/14 deadline will not be eligible.

[Filing No. 50-4 at 23.] Approximately 180 employees opted into the 2013 VSP and the 2014 VSP, including 80 employees who were female. [Filing No. 50-5 at 2; Filing No. 50-4 at 3.]

At various points, Ms. Barbera spoke with Ms. Freeman about whether severance would be available if Ms. Barbera chose to leave. [Filing No. 51 at 27.] At some point after the 2014 VSP was offered, Ms. Barbera had a conversation with Mr. Scheuring about the 2014 VSP; during that conversation, Mr. Scheuring made no assurances but represented that another VSP could come along in January 2015. [Filing No. 51 at 27.]

**B. Individuals who Received Severance Outside of the 2013 and 2014 VSP Periods**

A handful of individuals left Pearson's employ outside of the windows of time set forth in the 2013 VSP and the 2014 VSP and received severance benefits.

In September 2014, Paul Zale, who was the Director of Engineering at Pearson, left his job and received severance benefits. [Filing No. 50-4 at 3-4.] Earlier, in August 2014, Mr. Zale approached his supervisor Steve Wenz and asked if there was any possibility of severance. [Filing No. 50-2 at 2.] Mr. Zale was paid severance in the amount of two weeks for each year of service to Pearson, along with continued medical coverage through April 2015. [Filing No. 50-2 at 3.]

The terms of his separation were summarized in a letter dated September 3, 2014, signed by Debbie Freeman, which stated that severance would be paid in accordance with the Severance Policy. [Filing No. 50-2 at 4-5.] Mr. Zale's departure was unrelated to any transaction between Pearson and another entity. [Filing No. 50-4 at 4.]

In March 2015, Director of Operations Deborah Petra left her employment at Pearson because her position was eliminated and received severance benefits. [Filing No. 50-4 at 4.]

On April 17, 2015, Tony Ramsey, who was the Information Technology System Administrator at Pearson, left his job and received severance benefits. [Filing No. 50-2 at 6; Filing No. 50-5 at 2.] Ms. Barbera and Mr. Ramsey worked in the same department but reported to different supervisors, with Ms. Barbera reporting to Mr. Scheuring and Mr. Ramsey reporting to Mike Nicholson. [Filing No. 50-2 at 6.] Earlier, in April 2015, Mr. Ramsey approached Ms. Freeman and asked if there was any possibility of severance. [Filing No. 50-2 at 6.] Mr. Ramsey was paid severance in the amount of two weeks for each year of service to Pearson, along with continued medical coverage for 18 months following his separation. [Filing No. 50-2 at 7.] The terms of his separation were summarized in a letter dated April 17, 2015, signed by Debbie Freeman, which stated that severance would be paid in accordance with the Severance Policy. [Filing No. 50-2 at 9-13.] Mr. Ramsey's departure was unrelated to any transaction between Pearson and another entity. [Filing No. 50-5 at 2.]

In June 2015, Thomas Lukasik, who worked as a Key Account Manager at Pearson, left his job and received severance benefits. [Filing No. 50-2 at 21-22; Filing No. 50-5 at 2; Filing No. 51 at 25.] Prior to his departure, Mr. Lukasik's supervisor was Director of Operations Anthony Clark. [Filing No. 50-2 at 21.] In March 2015, Mr. Lukasik asked Mr. Nathanson if Pearson was going to do another round of budget reduction and Mr. Nathanson advised him to speak to Ms.

Freeman.  [Filing No. 50-2 at 21.]  At some time between the end of March and the middle of April 2015, Mr. Lukasik asked Ms. Freeman about the severance pay process.  [Filing No. 50-2 at 22.] In June, Mr. Lukasik left his job at Pearson and was paid two weeks of salary for every year of service at Pearson, and medical coverage through September 2015.  [Filing No. 50-2 at 22.]  Mr. Mr. Lukasik's exit from Pearson was unrelated to any transaction with another entity.  [Filing No. 50-5 at 2.]

### C.  Pearson's Transaction with R.R Donnelley

In late-July 2014, Pearson sent out a Request for Proposal ("RFP") seeking proposals from companies to operate Pearson's end-to-end print supply chain in North America.  [Filing No. 50-3 at 3.]  R.R. Donnelley was among the companies to respond to the RFP.  [Filing No. 50-3 at 3.]

In summer 2015, Pearson decided to transfer its warehouses, print, manufacturing, paper procurement, and supporting services to R.R. Donnelley, and provided R.R. Donnelley with a list of individuals employed at Pearson's warehouses.  [Filing No. 50-3 at 3.]  In July 2015, Mr. Scheuring, who supervised Ms. Barbera and others, provided R.R. Donnelley with ratings detailing his team's skills in order to assist R.R. Donnelley with making placement decisions within its organization.  [Filing No. 50-3 at 3.]  Regarding Ms. Barbera, Mr. Scheuring wrote:

Vicki is the top  Log Pro Analyst with the most broad understanding of the various businesses at Pearson.  She is very strong in APC and TMS with a good knowledge of WMS.  She also is has most knowledge of Connections and Assessments

[Filing No. 50-3 at 10.]

In August 2015, Mr. Scheuring exchanged several emails with Jeff Eisentraut, who was the Vice President of Information Technology at R.R. Donnelley.  [Filing No. 50-3 at 11-14.]  On August 20, 2015, Mr. Eisentraut asked Mr. Scheuring if he would consider Ms. Barbera and two other Pearson employees "super users."  [Filing No. 50-3 at 14.]  The next day, Mr. Eisentraut

again wrote to Mr. Scheuring concerning Ms. Barbera and the same two Pearson employees, this time stating:

> Based on the helpful information you provided I am viewing the above folks as super users - and that they really do no have any RPG or programming skills to go in and modify source code. Hence it would probably make most sense that they would report up to the business and John Ramich vs. being part of Andrew Wallace and team reporting up to me in IT - would you concur?

[Filing No. 50-3 at 12.] Mr. Scheuring responded as follows:

> Your assumption on Richard is correct. However I would categorize Laura and Vicki as more than super users. Instead I would call them system analysts. True they do not write RPG programs but they have technical capability. For example they both have mapped interfaces, participated in detailed program designs and have deep understanding of how Log Pro functions. Also both have headed up full warehouse implementations.

[Filing No. 50-3 at 11.] Mr. Scheuring ended his email with, "I hope that helps," to which Mr. Eisentraut replied, "Yes that does – I could use folks like Laura [Dwyer] and Vicki [Barbera] as there will be plenty of mapping/interface work coming down the pipe in the next 2 years." [Filing No. 50-3 at 11.]

On or around September 15, 2015, Mr. Scheuring, Ms. Barbera's supervisor, informed her that he would be asking her for data for quite some time because a transition was going to occur. [Filing No. 50-3 at 4; Filing No. 51 at 14; Filing No. 51 at 40.] Along with Ms. Barbera, Mike Nicholson and Laura Dwyer were also asked to gather data related to the transition. [Filing No. 51 at 14.] Thereafter, Mr. Scheuring would ask Ms. Barbera questions pertaining to specific data. [Filing No. 51 at 14.]

Around the same time, Mr. Scheuring began referring R.R. Donnelley to Mr. Wallace for technical questions that involved the intricacies of programming, applications, and hardware because of Mr. Wallace's expertise in that area. [Filing No. 50-3 at 5.] Meanwhile, Mr. Wallace came to Ms. Barbera to ask her questions regarding how certain things worked. [Filing No. 51 at 14-15.] Mr. Wallace would communicate information that he obtained to R.R. Donnelley at their

request.  [Filing No. 51 at 16.]  Ms. Barbera never asked anyone on Pearson's management team why Mr. Wallace was performing this function instead of her.  [Filing No. 51 at 16.]  Mr. Wallace attended meetings related to this function on a weekly or biweekly basis.  [Filing No. 51 at 14.]  Those meetings were attended by Jeff Eisentraut, Mike Nicholson, and others.  [Filing No. 51 at 15.]

On October 13, 2015, Pearson signed a contract governing the transfer of warehouses, print, manufacturing, paper procurement, and supporting services to R.R. Donnelley.  [Filing No. 50-3 at 3.]

In mid-January 2016, Pearson held a meeting to inform individuals who worked at Pearson's Indy North facility – including Ms. Barbera – that the facility and distribution operations would be transferred to R.R. Donnelley.  [Filing No. 51 at 10.]  At the meeting it was revealed that the majority of the employees would have the opportunity to "rebadge" by being offered a position with R.R. Donnelley and that their salaries and employment would be guaranteed for six months.  [Filing No. 51 at 10.]  This transaction affected approximately 700 employees, both male and female, who were informed that their employment with Pearson would be terminated on February 29, 2016.  [Filing No. 50-3 at 3.]

Along with information conveyed at the January 2016 meeting, Pearson employees were given a Frequently Asked Questions ("FAQ") memorandum.  [Filing No. 50-3 at 3-4.]  One question and answer in the FAQ memorandum dealt with severance:

> *If I choose to leave Pearson before the transition to RRD, will I receive a severance package?* Employees are not eligible for severance who opt to resign rather than transition to RR Donnelley.

[Filing No. 50-3 at 7.]

Ms. Barbera sent an email to Michael Nathanson, Pearson's Senior Vice President of Distribution, in January of 2016, around the time of the formal announcement of Pearson's transaction with R.R. Donnelley.  [Filing No. 49-1 at 2.][3]  Ms. Barbera also copied this email to Michael Scheuring, Pearson's Director of Supply Chain.  [Filing No. 49-1 at 2.]  Ms. Barbera's email message asked Mr. Nathanson whether she could receive severance pay rather than rebadging over to R.R. Donnelley, and stated that she would be happy to extend her employment long enough to help in the transition, but that she did want to leave.  [Filing No. 49-1 at 2.]  Mr. Nathanson responded within one workday by denying Ms. Barbera's request for severance pay, and stating that if she had wanted to exit with severance, she would have had to have asked for it within the deadline for the 2014 VSP.  [Filing No. 49-1 at 2.]  Ms. Barbera interpreted Mr. Nathanson's email as a reference to the Pearson Voluntary Severance Pay policy dated February 1, 2014.  [Filing No. 49-1 at 2.]  Mr. Nathanson's reply email to Ms. Barbera did not say anything about the R.R. Donnelley outsourcing or transaction being the reason why he was denying her request for severance. [Filing No. 49-1 at 3.]  Mr. Nathanson's reply email to Ms. Barbera did not say anything about "rebadging" being the reason why he was denying her request for severance.  [Filing No. 49-1 at 3.]

On February 18, 2016, Daniel Lennon wrote a letter to Ms. Barbera's counsel in response to correspondence dated February 8, 2016, which provided as follows:

---

[3] The facts set forth in this paragraph are taken as true pursuant to the Court's Order at Filing No. 62.

Pearson acknowledges and is grateful for the many years of service Ms. Barbera provided the Company. It recognizes her accomplishments and appreciates all of them. However, per the clear language of the Company's severance policy, Ms. Barbera is not entitled to severance.

Attached hereto as Exhibit 1 is a copy of Pearson's Severance Policy. The fifth paragraph under the "Policy" section states that, "Severance pay will not be paid to employees whose termination is the result of a merger or acquisition", as set forth in detail in the section titled "Severance as a Result of a Merger/Acquisition" of this policy. Under the "Severance as a Result of Merger/Acquisition" section of the policy, it clearly states that no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger….or any other transaction when such employee is offered employment by the purchaser or another employer in connection with the transaction…". That is exactly what occurred in Ms. Barbera's case. She is to be offered employment by R.R. Donnelly effective February 29, 2016 and therefore is not entitled to severance.

[Filing No. 49-6 at 2.]

R.R. Donnelley offered Ms. Barbera the same position she had held at Pearson – Manager of Business Analysis – at the North Indy facility, which would have taken effect March 1, 2016. [Filing No. 51 at 12.] Ms. Barbera refused this employment offer and communicated this refusal to R.R. Donnelley by not showing up for work on March 1, 2016. [Filing No. 51 at 12.] She later verified that she had refused R.R. Donnelley's employment offer over the telephone to Andrew Wallace after he called to inquire. [Filing No. 51 at 12.]

After Ms. Barbera's employment at Pearson ended, she made no attempts to seek new employment. [Filing No. 51 at 6.] Ms. Barbera has not earned any income since February 29, 2016. [Filing No. 51 at 32.]

**D. The Lawsuit**

Ms. Barbera initiated this lawsuit on September 23, 2016, and filed the operative Amended Complaint on February 15, 2017. [Filing No. 1; Filing No. 24.] Pearson has moved for summary judgment, [Filing No. 50], and that motion is now ripe for the Court's decision.

**IV.**

**DISCUSSION**

**A.  Sex Discrimination Claim**

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) (citing 42 U.S.C. § 2000e-2(a)(1)).  "To survive summary judgment on a Title VII discrimination claim, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Milligan-Grimstad v. Stanley*, __ F.3d __, 2017 WL 6276198, at *2 (7th Cir. Dec. 11, 2017) (quotation omitted).

This Court's analysis of Ms. Barbera's Title VII claim comes nearly a year and a half after the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).  Since that time, the Court of Appeals has had numerous opportunities to explain and apply *Ortiz* in a variety of employment contexts, and it is to this body of law that the Court now turns.  *Ortiz* "discarded the long-standing practice of distinguishing between 'direct' and 'indirect' evidence in analyzing discrimination claims." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017) (citation omitted).  Now, instead of separating evidence under different methods of proof, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cty., Illinois,* 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz,* 834 F.3d at 765).  In determining whether the evidence would permit a reasonable factfinder to conclude that Ms. Barbera's sex caused her to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and

assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Both Pearson and Ms. Barbera organize their arguments in terms of the *McDonnell Douglas* framework and the Court will follow suit. This familiar framework requires Ms. Barbera to show that: (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017). If Ms. Barbera makes this prima facie showing, the burden shifts to Pearson to come forward with a legitimate, nondiscriminatory reason for the challenged employment action. *Id.* If Pearson does this, then the burden shifts back to Ms. Barbera to produce evidence establishing a genuine dispute of fact about whether Pearson's reason was a pretext for discrimination. *Id.*

Ms. Barbera argues that Pearson discriminated against her in two ways: (1) by denying her severance; and (2) by denying her a role as an information technology liaison during the transition to R.R. Donnelley.

### 1. The Denial of Severance

Turning to the first issue, Pearson alleges that "*all* employees affected by Pearson's transaction with R.R. Donnelley – male and female" – were treated the same. [Filing No. 52 at 13 (emphasis in original).] Pearson additionally argues that Ms. Barbera cannot show that she was treated differently than the three male colleagues she identified because those individuals were not similarly situated. [Filing No. 52 at 13-14.]

In response, Ms. Barbera argues that she met her initial burden regarding her sex discrimination claim by showing that: "(1) she is female; (2) she was receiving 'outstanding' performance evaluations; (3) she suffered an adverse employment action in that she was denied severance pay when she requested it, and (4) three male colleagues were treated more favorably . . . in that they were granted severance pay when they were ineligible under the explicit terms of the plan." [Filing No. 60 at 12.]

In its reply brief, Pearson reiterates that Ms. Barbera's alleged comparators received severance under "completely different circumstances" than existed at the time of her requests for severance because her requests implicated Pearson's severance policy provision while the alleged comparators' requests did not. [Filing No. 61 at 3-4.]

In identifying one or more similarly situated individuals outside her protected class who received better treatment, Ms. Barbera must submit evidence that she and the similarly situated male employees "reported to the same supervisor, engaged in the same conduct, and had the same qualifications," and that "there were no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'" *Johnson v. Chicago Transit Auth.*, 699 F. App'x 558, 559 (7th Cir. 2017) (citations omitted).

Ms. Barbera identifies three men who received severance outside the periods of time contemplated in the 2013 VSP and the 2014 VSP: Paul Zale, Tony Ramsey, and Thomas Lukasik. The record indicates that each of these individuals reported to different supervisors,[4] and is largely

---

[4] While Ms. Barbera reported to Michael Scheuring, [Filing No. 50-2 at 6,] Mr. Zale reported to Steve Wenz, [Filing No. 50-2 at 2], Mr. Ramsey reported to Mike Nicholson, [Filing No. 50-2 at 6], and Mr. Lukasik reported to Anthony Clark, [Filing No. 50-2 at 21].

silent on the individuals' various qualifications. That said, "the similarly situated analysis is flexible, and the result depends on any relevant factors and common sense." *Majors v. Gen. Electric Co.,* 714 F.3d 527, 538 (7th Cir. 2013). The Court will, therefore, look past unduly technical distinctions among the individuals.

The problem with Ms. Barbera's reliance on these individuals as comparators is that they left Pearson in September 2014, April 2015, and June 2015, respectively – well before Ms. Barbera alleges she made her first severance request "sometime in the later part of 2015."[5] [Filing No. 60 at 4.] The distinction in the timing of the requests is significant given the evidence that the situation at Pearson evolved significantly over the course of 2015. The record indicates, for example, that in July 2015, Mr. Scheuring began providing R.R. Donnelley with ratings detailing his team's skills in order to assist R.R. Donnelley with making placement decisions within its organization. [Filing No. 50-3 at 3; Filing No. 50-3 at 10.] By September, Mr. Scheuring informed Ms. Barbera that he would be asking her for data because a transition was going to occur. [Filing No. 51 at 14; Filing No. 51 at 40.] And on October 13, 2015, Pearson signed a contract governing the transfer of warehouses, print, manufacturing, paper procurement, and supporting services to R.R. Donnelley. [Filing No. 50-3 at 3.] There existed, therefore, a major differentiating or mitigating circumstance that distinguishes Pearson's treatment of individuals who requested severance in late 2014 and early 2015 from Ms. Barbera who requested severance, at the earliest, in the latter half of 2015. In short, Pearson's impending transaction with R.R. Donnelley with the promise of continued to

_____

[5] The Court notes that Ms. Barbera contends in her response brief that "there is no evidence in the record to indicate" whether Ms. Barbera made three alleged requests for severance "before or after September, 2015." [Filing No. 60 at 14 n.3.] The only evidence of these requests consists of Ms. Barbera's deposition testimony on the subject. However, the burden of identifying similarly situated individuals falls on Ms. Barbera. At no point does Ms. Barbera allege, let alone show, that she made requests for severance in the same period of time as Mr. Zale, Mr. Ramsey, or Mr. Lukasik.

employment to individuals such as Ms. Barbera, constitutes a differentiating circumstance, such that the individuals identified by Ms. Barbera are not similarly situated.

This differentiating circumstance is also demonstrated by the Severance Policy, which provides that "no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger, consolidation, liquidation, dissolution, or any other transaction when such employee is offered employment by . . . another employer in connection with the transaction." [Filing No. 50-4 at 11.] Neither Mr. Zale, nor Mr. Ramsey, nor Mr. Lukasik were offered employment by another employer under the terms of the Severance Policy. [Filing No. 50-4 at 4; Filing No. 50-5 at 2.] Nor is there any evidence that any of Ms. Barbera's proposed comparators would have been given a job by R.R. Donnelley after its transaction with Pearson. Ms. Barbera, however, was offered the same position she had held at Pearson – Manager of Business Analysis – at the North Indy facility with R.R. Donnelley, which would have taken effect March 1, 2016. [Filing No. 51 at 12.] She was one of approximately 700 employees, both male and female, who were informed that their employment with Pearson would be terminated on February 29, 2016. [Filing No. 50-3 at 3.] Had Pearson offered Ms. Barbera severance in January or February 2016, it would have been treating her differently than the 700 other individuals who were offered new jobs with R.R. Donnelley, none of whom were eligible for severance under the terms of the Severance Policy.

Likewise, there is no evidence that there were any similarly situated male employees – meaning employees who left Pearson's employ after July 2015 – who were offered positions with R. R. Donnelly and were also offered severance. Indeed, Ms. Barbera's own deposition testimony establishes that no male employee of the Indy North distribution center whose employment terminated on the same day as Ms. Barbera's was offered severance pay from Pearson, [Filing No. 51 at 28], and that the sale to R.R. Donnelley affected Ms. Barbera and other managers of business

analysis – male and female – in the same way, [Filing No. 51 at 10].  Ms. Barbera was not similarly situated to her proposed comparators; she was similarly situated to hundreds of employees who were offered new jobs with R.R. Donnelley, and the evidence shows that she was similarly treated to them.

Having failed to meet her burden under *McDonnell Douglas*, the Court need not proceed to analyze Ms. Barbera's allegations regarding severance under the burden shifting method.  Instead, returning to the guidance set forth in *Ortiz*, Ms. Barbera's failure to meet her burden under *McDonnell-Douglas* demonstrates that there is insufficient evidence, when taken as a whole, to permit a reasonable factfinder to conclude that Ms. Barbera was denied severance because of her sex.

Although Ms. Barbera has not set forth a prima facie case of sex discrimination, the Court will briefly consider the issue of pretext.  To show pretext, Ms. Barbera must establish that a "phony reason (not just an unfounded one)" was given for her denial of severance.  *Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (citing *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013); *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)).  Such an inquiry requires this Court to "evaluate the honesty of the employer's explanation, rather than its validity or reasonableness."  *Hill*, 724 F.3d at 968 (citations omitted).  Ms. Barbera alleges that she made two requests for severance in early 2016, each of which she contends were denied under a false pretext.  [Filing No. 60 at 15-18.]  As to Ms. Barbera's request in January 2016, Mr. Nathanson responded by stating "that if she had wanted to exit with severance, she would have had to have asked for it within the deadline for the 2014 Voluntary Severance Program ("VSP")."  [Filing No. 49-1 at 2.]  As to her request in February 2016, Mr. Lennon responded by stating that Ms. Barbera was not entitled to severance "per the clear language" of the Severance Policy because

she was being offered employment by R.R. Donnelley.  [Filing No. 49-6 at 2.]  Nothing in the record suggests that either of those reasons were proffered by Pearson in order to mask unlawful discrimination or that Pearson lied about its reasons for not offering Ms. Barbera severance.  Ms. Barbera may believe that Pearson's reasons for denying her severance in January and February 2016 were unfounded, but she has not met her burden of proving by a preponderance of the evidence that the reasons were pretext for discrimination.

### 2. *The Denial of an Information Technology Role*

Turning next to Ms. Barbera's contention that she was denied a specific role during the transition to R.R. Donnelley, Pearson alleges that it cannot be held responsible for denying her an "Information Technology contact position" because it did not create any such position - R.R. Donnelley did.  [Filing No. 52 at 13.]

Ms. Barbera contends that Pearson is responsible for denying her an information technology liaison role at R.R. Donnelley under the "cat's paw" theory, wherein an employer is liable for tainting or influencing an independent decision maker with the employer's illegal motives.  [Filing No. 60 at 18.]  Specifically, she alleges "[a]lthough Mr. Scheuring was not technically the final decisionmaker" about what position to offer her at R.R. Donnelley, "it is clear that R.R. Donnelley was relying heavily on Mr. Scheuring's recommendations in making its decision," and that she "has raised a sufficient issue of fact for a jury to decide whether Pearson should have placed her in the IT liaison role."  [Filing No. 60 at 19.]

Pearson responds that failing to place Ms. Barbera in a position that did not exist is not an adverse employment action under Title VII.  [Filing No. 61 at 12.]  Moreover, Pearson contends that Ms. Barbera's cat's paw theory "simply does not make sense."  [Filing No. 61 at 13.]  Finally,

Pearson argues that there is simply no evidence that Mr. Scheuring has any discriminatory animus toward Ms. Barbera. [Filing No. 61 at 13.]

The "cat's paw" theory that Ms. Barbera presents provides that courts may find direct evidence of discrimination where "a biased subordinate" who lacks decision making power to fire an employee "uses a formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citations and quotations omitted). Applying the cat's paw theory to the case at hand is inapposite at each turn. First, Ms. Barbera's "biased subordinate" is, in fact, not a subordinate at all, let alone one who lacked decision making power. To the contrary, Mr. Scheuring was Ms. Barbera's direct supervisor. [Filing No. 50-2 at 6.] Second, the employer that Ms. Barbera seeks to hold liable – Pearson – is not the entity that Ms. Barbera claims was used to trigger a discriminatory employment action by a biased subordinate. In her response brief, she specifically alleges that "it is clear that R.R. Donnelley was relying heavily on Mr. Scheuring's recommendations in making its decision." [Filing No. 60 at 19.] But R.R. Donnelley can incur liability for sex discrimination only if Ms. Barbera can "prove the existence of an employer-employee relationship" with R.R. Donnelley. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017) (quoting *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015)). In this case, Ms. Barbera was never an employee of R.R. Donnelley, having refused its employment offer by not showing up for work on March 1, 2016. [Filing No. 51 at 12.] Even if the facts of this case could be shoehorned into the cat's paw theory, there is no evidence in the record that Mr. Scheuring harbored a discriminatory animus toward Ms. Barbera. Quite the opposite is true. The record contains evidence that Mr. Scheuring informed R.R. Donnelley that Ms. Barbera was "very strong" with "a good knowledge" of systems and the "most knowledge" of connections and assessments,

[Filing No. 50-3 at 10], that she was "more than a superuser" and had a "deep knowledge" of certain company functions, [Filing No. 50-3 at 11]. For these reasons, the Court finds that there is insufficient evidence to draw any conclusion of discrimination under the cat's paw theory.

Ms. Barbera has not set forth a prima facie case of sex discrimination related to the denial of severance or the denial of any role with R.R. Donnelley. Accordingly, her sex discrimination claim fails as a matter of law, and Pearson is entitled to summary judgment on that claim.[6]

### B. Equal Pay Act Claim

Nearly five months after filing her complaint, Ms. Barbera filed an Amended Complaint adding a cause of action pursuant to the Equal Pay Act. [Filing No. 24.] In its Motion for Summary Judgment, Pearson argues that Ms. Barbera's Equal Pay Act claim fails because "Pearson had a gender-neutral justification for providing severance benefits to the three male colleagues Ms. Barbera identified: the ending of their employment occurred under wholly different circumstances not

---

[6] Although Ms. Barbera's Title VII claim fails as a matter of law on its merits, the Court will briefly address Ms. Barbera's efforts to mitigate her damages consistent with the Circuit's "longstanding" and "repeatedly reaffirmed" framework for evaluating mitigation questions. *Stragapede v. City of Evanston, Illinois*, 865 F.3d 861, 868 (7th Cir. 2017). To prove a failure to mitigate in this context, the Pearson must show that (1) Ms. Barbera failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that she might have found comparable work by exercising reasonable diligence. *Id.* at 868 (quoting *Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir. 1990)).

Here, notwithstanding her unsuccessful efforts to earn an income by day trading, the evidence establishes that Ms. Barbera turned down a guaranteed six months at her Pearson salary, [Filing No. 51 at 12], made no attempts to seek new employment, [Filing No. 51 at 6], and has not earned any income since February 29, 2016, [Filing No. 51 at 32]. Given these facts, and considering Ms. Barbera's considerable educational background and work experience, it is all but established that she failed to mitigate her damages. *See, e.g., Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771-72 (7th Cir. 2006) (finding a failure to mitigate where a plaintiff with "vast experience plus an educational background that includes a master's degree in biomedical engineering" contacted 23 firms without success). However, having decided the case on the grounds that Ms. Barbera has not set forth a prima facie case of sex discrimination, the Court need not make a specific finding on this issue.

applicable to Ms. Barbera when she finally expressed her desire to leave Pearson voluntarily." [Filing No. 52 at 25.]  In response, Ms. Barbera makes no specific arguments regarding her Equal Pay Act claim.  [Filing No. 60.]  In its reply brief, Pearson notes that Ms. Barbera does not distinguish between her Title VII and Equal Pay Act claims, and it accordingly addresses such claims together in its reply.  [Filing No. 61 at 2.]

The Equal Pay Act prohibits an employer from discriminating between employees on the basis of sex.  29 U.S.C. § 206(d)(1).  "To establish a prima facie cause of action under the Act, an employee must demonstrate a difference in pay for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Lauderdale v. Illinois Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (citation and quotation omitted).  The Act provides four affirmative defenses by which the employer can claim the discrepancy is not discriminatory: "where . . . payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* at 907 (quoting 29 U.S.C. § 206(d)(1)).  "An employer asserting that the difference is the result of a 'factor other than sex' must present this contention as an affirmative defense—and the proponent of an affirmative defense has the burdens of both production and persuasion." *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012).

Ms. Barbera fails to mention the Equal Pay Act in her response to Pearson's Motion for Summary Judgment and otherwise fails to set forth a prima facie cause of action under the Act. However, even if the Court were to infer that Mr. Zale, Mr. Ramsey, and Mr. Lukasik are the relevant comparators for the purposes of Ms. Barbera's Equal Pay Act claim, this claim fails for the same reason that her Title VII claim fails.  Even assuming *arguendo* that Ms. Barbera was able

to demonstrate a prima facie cause of action under the Equal Pay Act, the three individuals she identifies as having been similarly situated left Pearson before the company began its transition with R.R. Donnelley. [Filing No. 50-3 at 3; Filing No. 50-3 at 10.] Just as this distinction in timing constitutes a "mitigating circumstance" under Title VII, it also proves to be a "differential based on a factor other than sex" under the Equal Pay Act. As such, Ms. Barbera's Equal Pay Act claim fails as a matter of law, and Pearson is entitled to summary judgment on that claim.

## V.
### CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, [66], and **GRANTS** Pearson's Motion for Summary Judgment, [50]. Final judgment shall enter accordingly.

Date: 12/28/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**