

# UNITED STATES DISTRICT COURT
## Southern District of Indiana

### Laura A. Briggs, Clerk of Court

Birch Bayh Federal Building
& U.S. Courthouse, Room 105
46 East Ohio Street
Indianapolis, IN  46204
(317) 229-3700

U.S. Courthouse, Room 104
921 Ohio Street
Terre Haute, IN 47807
(812) 231-1840

Winfield K. Denton Federal Building
& U. S. Courthouse, Room 304
101 NW Martin Luther King Blvd.
Evansville, IN 47708
(812) 434-6410

Lee H. Hamilton Federal Building
& U.S. Courthouse, Room 210
121 West Spring Street
New Albany, IN 47150
(812) 542-4510

January 11, 2018

Kathleen Ann DeLaney
Annavieve C. Conklin
DELANEY & DELANEY LLC
3646 North Washington Blvd.
Indianapolis, IN 46205

Cynthia K. Springer
Sarah V. Bowers
FAEGRE BAKER & DANIELS LLP
300 North Meridian Street
Suite 2700
Indianapolis, IN 46204

RE:  VICKI BARBERA v. PEARSON EDUCATION, INC.

CAUSE NO:  1:16-cv-02533-JMS-DML

Dear Appellant and Appellee:

Please be advised that the Notice of Appeal filed in 1:16-cv-02533-JMS-DML has been forwarded to the United States Court of Appeals for the Seventh Circuit. The Clerk of the Seventh Circuit will assign an appellate case number, docket the appeal, and notify case participants of the Seventh Circuit case number assigned to this matter.

Filing a "Designation of Record" in the U.S. District Court case helps ensure that the appropriate documents (*e.g.*, pleadings and attachments, briefs) are effectively transmitted to the Seventh Circuit. A copy of the docket sheet in this case has been included for your convenience. The docket sheet may be annotated (by circling docket numbers, or highlighting electronically) to identify the docket entries that are to be included in the appellate record, then attached as an exhibit to the Designation of Record. The designation may also simply list the docket entry numbers (all attachments to each entry will be included) along with a description of the designated documents.

Please review Southern District of Indiana Local Rule 76-1 and Seventh Circuit Rule 10 (enclosed) for guidance regarding the designation of a record, and comply with the provisions of Federal Rule of Civil Procedure 5 when filing the designation.

Please contact the Clerk's office with any questions or concerns.

Sincerely,
Laura A. Briggs,
Clerk of Court

By Maggie Twigg, Deputy Clerk
812-542-4510

## <u>Selected Rules for Reference</u>

Local Rule 76-1 - Designating Additional Items For Record on Appeal

> An appellant designating items for the record on appeal under Circuit Rule 10(a) must serve a proposed joint designation on the appellee with the notice of appeal. The parties must then confer and, if they agree, prepare a joint designation, highlighting those entries on the court's docket sheet if it is practical to do so. The joint designation must be filed with the clerk within 14 days after the notice of appeal is filed. If the parties cannot reach agreement on a joint designation, each party must submit a separate designation within 14 days after filing the notice of appeal.

> <u>NOTE</u>:   The complete Local Rules for the U.S. District Court, Southern District of Indiana,
> are available at:  http://www.insd.uscourts.gov/local-rules

## **CIRCUIT RULE 10. Preparation of Record in District Court Appeals**

   (a) *Record Preparation Duties.* The clerk of the district court shall prepare within 14 days of filing the notice of appeal the original papers, transcripts filed in the district court, and exhibits received or offered in evidence (with the exceptions listed below). The transcript of a deposition is "filed" within the meaning of this rule, and an exhibit is "received or offered," to the extent that it is tendered to the district court in support of a brief or motion, whether or not the rules of the district court treat deposition transcripts or exhibits as part of the record. These materials may be designated as part of the record on appeal without the need for a motion under Fed. R. App. P. 10(e). Counsel must ensure that exhibits and transcripts to be included in the record which are not in the possession of the district court clerk are furnished to the clerk within fourteen days after the filing of the notice of appeal. The following items will not be included in a record unless specifically requested by a party by item and date of filing within fourteen days after the notice of appeal is filed or unless specifically ordered by this court:

> briefs and memoranda,
>
> notices of filings,
>
> subpoenas,
>
> summonses,
>
> motions to extend time,
>
> affidavits and admissions of service and mailing,
>
> notices of settings,
>
> depositions and notices, and
>
> jury lists.

   (b) *Correction or Modification of Record.* A motion to correct or modify the record pursuant to Rule 10(e), Fed. R. App. P., or a motion to strike matter from the record on the ground that it is not properly a part thereof shall be presented first to the district court. That court's order ruling on the motion will be transmitted to this court as part of the record.

   (c) *Order or Certification with Regard to Transcript.* Counsel and court reporters are to utilize the form prescribed by this court when ordering transcripts or certifying that none will be ordered. For specific requirements, see Rules 10(b) and 11(b), Fed. R. App. P.

   (d) *Ordering Transcripts in Criminal Cases.*

   (1) *Transcripts in Criminal Justice Act Cases.* At the time of the return of a verdict of guilty or, in the case of a bench trial, an adjudication of guilt in a criminal case in which the defendant is represented by counsel appointed under the Criminal Justice Act (C.J.A.), counsel for the defendant shall request a transcript of testimony and other relevant proceedings by

completing a C.J.A. Form No. 24 and giving it to the district judge. If the district judge believes an appeal is probable, the judge shall order transcribed so much of the proceedings as the judge believes necessary for an appeal. The transcript shall be filed with the clerk of the district court within 40 days after the return of a verdict of guilty or, in the case of a bench trial, the adjudication of guilt or within seven days after sentencing, whichever occurs later. If the district judge decides not to order the transcript at that time, the judge shall retain the C.J.A. Form No. 24 without ruling. If a notice of appeal is filed later, appointed counsel or counsel for a defendant allowed after trial to proceed on appeal in forma pauperis shall immediately notify the district judge of the filing of a notice of appeal and file or renew the request made on C.J.A. Form No. 24 for a free transcript.

(2) *Transcripts in Other Criminal Cases.* Within 14 days after filing the notice of appeal in other criminal cases, the appellant or appellant's counsel shall deposit with the court reporter the estimated cost of the transcript ordered pursuant to Rule 10(b), Fed. R. App. P., unless the district court orders that the transcript be paid for by the United States. A non-indigent appellant must pay a pro rata share of the cost of a transcript prepared at the request of an indigent co-defendant under the Criminal Justice Act unless the district court determines that fairness requires a different division of the cost. Failure to comply with this paragraph will be cause for dismissal of the appeal.

(e) *Indexing of Transcript.* The transcript of proceedings to be transmitted to this court as part of the record on appeal (and any copies prepared for the use of the court or counsel in the case on appeal) shall be bound by the reporter in a volume or volumes, with the pages consecutively numbered throughout all volumes. The transcript of proceedings, or the first volume thereof, shall contain a suitable index, which shall refer to the number of the volume as well as the page, shall be cumulative for all volumes, and shall include the following information:

(1) An alphabetical list of witnesses, giving the pages on which the direct and each other examination of each witness begins.

(2) A list of exhibits by number, with a brief description of each exhibit indicating the nature of its contents, and with a reference to the pages of the transcript where each exhibit has been identified, offered, and received or rejected.

(3) A list of other significant portions of the trial such as opening statements, arguments to the jury, and instructions, with a reference to the page where each begins.

When the record includes transcripts of more than one trial or other distinct proceeding, and it would be cumbersome to apply this paragraph to all the transcripts taken together as one, the rule may be applied separately to each transcript of one trial or other distinct proceeding.

(f) *Presentence Reports*. The presentence report is part of the record on appeal in every criminal case. The district court should transmit this report under seal, unless it has already been placed in the public record in the district court. If the report is transmitted under seal, the report may not be included in the appendix to the brief or the separate appendix under Fed. R. App. P. 30 and Circuit Rule 30. Counsel of record may review the presentence report at the clerk's office but may not review the probation officer's written comments and any other portion submitted in camera to the trial judge.

(g) *Effect of Omissions from the Record on Appeal.* When a party's argument is countered by a contention of waiver for failure to raise the point in the trial court or before an agency, the party opposing the waiver contention must give the record cite where the point was asserted and also ensure that the record before the court of appeals contains the relevant document or transcript.

NOTE:   The complete Federal Rules of Appellate Procedure & Rules of the 7th Circuit Court of Appeals are available at: http://www.ca7.uscourts.gov/Rules/Rules/rules.pdf

## THE SETTLEMENT CONFERENCE PROGRAM
## U.S. COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Pursuant to Rule 33 of the Federal Rules of Appellate Procedure[1] and Circuit Rule 33, the Court conducts conferences with counsel and clients to encourage and facilitate the settlement of civil appeals. Rule 33 conferences are conducted in all types of fully-counseled civil appeals except immigration, social security, habeas corpus, prisoners' civil rights, sentencing, and mandamus cases. The Court spontaneously notices most eligible appeals for Rule 33 conferences. Attorneys for one or more parties may also request that a conference be conducted in any eligible case.

Counsel and clients are well-advised to explore opportunities for settlement at the appellate level.Regardless of how unlikely it may seem, the fact is that many cases can be settled at this stage, substituting a certain and acceptable outcome for the risk and expense of further litigation. The Court's Settlement Conference Office has assisted counsel in settling many appeals without unduly delaying the progress of those appeals which do not yield to settlement efforts.     The following information is intended to assist practitioners and their clients in understanding how the Seventh Circuit's settlement conference program works and how they can make the best use of it to achieve favorable results.

- **How do counsel learn that a Rule 33 conference will be conducted in their appeal?**
  A Notice of Rule 33 Settlement Conference is posted on the docket. The Notice is an order of the Court advising counsel of the date and time of the conference, whether it is to be in person or by telephone, and how they and their clients are expected to prepare.

- **How can a Rule 33 conference be requested?**
  Counsel are invited to request a Rule 33 conference by contacting the Settlement Conference Office, U.S. Court of Appeals for the Seventh Circuit, 219 S. Dearborn, Room 1120, Chicago, Illinois 60604-1705 (Tel. (312) 435-6883/Fax (312) 435-6888/E-mail:  settlement@ca7.uscourts.gov ). At the request of any party or parties in an eligible appeal, the Settlement Conference Office will schedule a Rule 33 conference if its calendar permits. Counsel are then advised by notice that a conference will be held.

- **Do other parties have to be informed that a conference was requested?**
  No. If a party prefers to keep its request confidential, the Settlement Conference Office will not disclose to other parties or to the Court that the conference was requested.

- **Is participation in Rule 33 conferences optional?**
  No. When a Rule 33 conference is scheduled, participation is mandatory.

- **Are clients required to attend?**
  Clients and insurance representatives are required to attend Rule 33 conferences whenever the Settlement Conference Office so directs. When clients or insurance representatives have not been directed to attend the initial conference, they must be available by phone – with full settlement authority – for the duration of the conference.

- **Is it mandatory to settle?**
  No. Whether to settle is ultimately for the parties and their counsel to decide. However, counsel and parties are required to participate with the utmost diligence and good faith. Experience shows that settlements can often be achieved when neither side thought it possible.

---

[1] FRAP Rule 33 provides: "Appeal Conferences. The Court may direct the attorneys, and in appropriate cases the parties, to participate in one or more conferences to address any matter that may aid in the disposition of the proceedings, including the simplification of the issues and the possibility of settlement. A conference may be conducted in person or by telephone and be presided over by a judge or other person designated by the court for that purpose. Before a settlement conference, attorneys must consult with their clients and obtain as much authority as feasible to settle the case. As a result of a conference, the court may enter an order controlling the course of the proceedings or implementing any settlement agreement."

- **Who conducts Rule 33 conferences?**
  The Court has delegated the responsibility for conducting Rule 33 conferences to three full-time conference attorneys: Joel N. Shapiro, Rocco J. Spagna, and Jillisa Brittan. All were civil litigators in private practice prior to their appointment by the Court.

- **Is there a fee for the services of the conference attorney?**
  No. The assistance of the Settlement Conference Office is available to appellate litigants at no charge.

- **Must each party's lead attorney attend the Rule 33 conference?**
  Yes. It is essential that each party be represented at the Rule 33 conference by an attorney who not only is conversant with the case but is the attorney on whose advice the party relies. If more than one attorney meets these criteria, either of them may represent the client in the Rule 33 conference.

- **How is it decided whether a Rule 33 conference will be conducted by telephone or in person?**
  When all participants reside in the Chicago metropolitan area, Rule 33 conferences are usually held in the Settlement Conference Office at the United States Courthouse. Otherwise, conferences are generally conducted by telephone. The telephone equipment used in these conferences can accommodate more than a dozen separate lines and enables the conference attorney to speak privately with any combination of participants. Experience indicates that telephone conferences are generally as effective as in-person conferences in fostering settlements.

- **Are in-person conferences ever held outside Chicago?**
  Because the resources of the settlement conference program are limited, in-person conferences cannot routinely be held throughout the Circuit. However, from time to time in-person conferences are conducted at locations other than Chicago. If the participants believe that an in-person conference outside Chicago would be more productive than a conference by telephone, they are welcome to suggest it.

- **Are Rule 33 conferences confidential?**
  Yes. The Court requires all participants to keep what is said in these conferences strictly confidential. Communications, oral and written, which take place in the course of Rule 33 proceedings may not be disclosed to anyone other than the litigants, their counsel, and the conference attorney.

- **Do judges of the Court of Appeals learn what has happened at a Rule 33 conference?**
  No. Participants in Rule 33 conferences, including the conference attorney, are forbidden to impart to any judge or other court personnel, in the Court of Appeals or elsewhere, what has been communicated in these conferences.

- **What occurs at a Rule 33 conference?**
  Rule 33 conferences are official proceedings of the Court but are off-the-record and relatively informal. Discussion is conversational rather than argumentative. The focus is on realistically assessing the prospects of the appeal, the risks and costs of further litigation, the interests of the parties, and the benefits each side can gain through settlement. The conference attorney ordinarily meets with counsel both together and separately. Settlement proposals are discussed. A resolution may or may not be reached during the initial conference. Often, follow-up conferences or shuttle negotiations are conducted. Letters or draft proposals may be exchanged. By the conclusion of the Rule 33 process, the parties will have either reached an agreement to settle or learned how far apart they are and what are the remaining obstacles to settlement.

- **Is discussion of settlement limited to the appeal itself?**
  Not necessarily. If settlement of the appeal will not dispose of the entire case, or if related litigation is pending in other forums, the parties are invited and encouraged to explore the possibility of a global settlement.

- **Is briefing deferred when a Notice of Rule 33 Conference is issued?**
  Briefing is usually postponed until after the initial conference. If further modification of the briefing schedule would be conducive to settlement, an order to that effect may later be entered. What preparation is required of

counsel? In preparation for the initial Rule 33 conference, attorneys are required to consult rigorously with their clients and obtain as much authority as feasible to settle the case. Counsel must also review their legal and factual contentions with a view to being able to discuss candidly the prospects of the appeal and the case as a whole. If the conference attorney requests copies of pleadings, hearing transcripts, or other material in anticipation of the conference, counsel are expected to provide it promptly.

- **What is the role of the conference attorney?**
Because the format of Rule 33 conferences is flexible and each appeal is dealt with on its own terms, the conference attorney plays a variety of roles. He or she acts as moderator, facilitator, and intermediary. The conference attorney serves as a neutral evaluator and a reality check. He or she may suggest terms of settlement. Without being coercive, the conference attorney acts as a determined advocate for settlement.

- **What can counsel expect of the conference attorney**?
Before the initial conference, the conference attorney will have familiarized him or herself with the history of the litigation, the posture of the case, and the issues on appeal. During the conference, the conference attorney will seek additional information about the background of the dispute and the parties' interests, claims and defenses in order to explore all possibilities for a voluntary resolution. The conference attorney is strictly impartial. He or she does not advocate for any party and avoids making comments that could advantage one side or another in arguing the issues on appeal. The conference attorney will disclose any affiliation or prior representation of which he or she is aware that could call his or her neutrality into question. The conference attorney does not force any party to settle or to accept terms it is not willing to accept. While he or she urges parties to take advantage of opportunities to settle favorably, the conference attorney recognizes that settlement is not always possible.

- **How can counsel make best use of the Rule 33 conference to benefit their clients?**
Recognize that the Rule 33 conference is an opportunity to achieve a favorable outcome for your client. Without laying aside the advocate's responsibility, approach the conference as essentially cooperative rather than adversarial. Help your client make settlement decisions based not on overconfidence or wishful thinking, but on a realistic assessment of the case; not on emotion, however justified it may be, but on rational self-interest. Suggest terms of settlement that maximize the benefits of settlement for all parties. Take advantage of the opportunity to talk confidentially and constructively with counsel for the other parties and, if clients are present, to address them respectfully but convincingly. Let the conference attorney know how he or she can help you obtain a satisfactory resolution. Be candid. Don't posture. Listen closely to what other participants have to say. Give the process a chance to work.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISON

| | | |
|---|---|---|
| VICKI BARBERA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.:  1:16-cv-02533-JMS-DML |
| | ) | |
| PEARSON EDUCATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiff Vicki Barbera, by counsel, appeals to the United

States Court of Appeals for the Seventh Circuit from the District Court's December 28, 2017,

Order granting summary judgment in favor of Defendant Pearson Education, Inc., and overruling

Plaintiff's objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, and the

Entry of final judgment against Plaintiff.  *See* Docket Nos. 70-71.

Respectfully submitted,

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney (#18604-49) (Counsel of Record)
Annavieve C. Conklin (#33875-32)
Attorneys for Plaintiff

DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of January, 2018, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CMECF system.

Cynthia K. Springer
Sarah K. Bowers
Faegre Baker Daniels
Cynthia.springer@faegrebd.com
Sarah.bowers@faegrebd.com

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney

DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISON

VICKI BARBERA,                          )
                                        )
    Plaintiff,                      )
                                        )
    v.                              )          CAUSE NO.:  1:16-cv-02533-JMS-DML
                                        )
PEARSON EDUCATION, INC.,                )
                                        )
    Defendant.                      )

## PLAINTIFF/APPELLANT'S DOCKETING STATEMENT

Plaintiff/Appellant Vicki Barbera ("Barbera"), by counsel and pursuant to Seventh

Circuit Rule 3(c)(1), hereby submits her Docketing Statement.

### Court of Appeals Jurisdiction

Barbera brought this lawsuit against her former employer, Defendant Pearson Education,

Inc. ("Pearson"), claiming that Pearson discriminated against her on the basis of her gender, in

violation of Title VII of the Civil Rights Act of 1964, as amended, and the Equal Pay Act.

Jurisdiction in the District Court was based on Section 706(f)(1) and (3) of Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3), and the Equal Pay

Act, 29 U.S.C. § 206(d) and 28 U.S.C. § 1331.  This appeal is taken from a final judgment, dated

December 28, 2017, dismissing all of Plaintiff's claims, with prejudice.

Plaintiff timely filed a notice of appeal on January 10, 2018.  This Court has jurisdiction

to hear this appeal pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 1294(1).

Respectfully submitted,

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney (#18604-49) (Counsel of Record)
Annavieve C. Conklin (#33875-32)
Attorneys for Plaintiff

DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of January, 2018, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CMECF system.

Cynthia K. Springer
Sarah K. Bowers
Faegre Baker Daniels
Cynthia.springer@faegrebd.com
Sarah.bowers@faegrebd.com

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney

DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205

Case 1:16-cv-02533-JMS-DML   Document 70   Filed 12/28/17   Page 11 of 26 PageID #: 724

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VICKI BARBERA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | No. 1:16-cv-2533-JMS-DML |
| | ) | |
| PEARSON EDUCATION, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORDER

Plaintiff Vicki Barbera, who is female, worked for Defendant Pearson Education, Inc.
("Pearson"), an education publishing company, for 27 years. During her tenure, Ms. Barbera
worked in a variety of roles, most recently as a Manager of Business Analysis. In January 2016,
Pearson announced that 700 warehouse employees – including Ms. Barbera – would no longer be
employed by Pearson but would, instead, be employed by R.R. Donnelley & Sons Company ("R.R.
Donnelley"). After Ms. Barbera declined to accept a job offer from R.R. Donnelley, she brought
this lawsuit against Pearson alleging sex discrimination and a violation of the Equal Pay Act. Pear-
son moved for summary judgment, [Filing No. 50], and that motion is now ripe for the Court's
review. In addition, Ms. Barbera filed an Objection to the Magistrate Judge's Order on Plaintiff's
Motion for Sanctions, [Filing No. 66], which the Court will also consider herein.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because
there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment
as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear,
whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### EVIDENTIARY MATTERS

Before setting forth the facts in this case, the Court will first consider Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions.  [Filing No. 66 (objecting to Filing No. 62).]

On November 22, 2017, the Magistrate Judge assigned to this case issued an Order on Plaintiff's Motion for Sanctions.  [Filing No. 62 (granting in part and denying in part Filing No. 48)].  The main point of contention concerned an email Ms. Barbera alleges she sent to Michael Nathanson, Pearson's Senior Vice President of Distribution, in January 2016.  [Filing No. 62 at 3.]  During discovery, Pearson did not produce Ms. Barbera's email exchange with Mr. Nathanson.  [Filing No. 62 at 5.]  The Magistate Judge found that "[t]he record before the court shows that Pearson should reasonably have anticipated litigation involving Ms. Barbera and the denial of severance pay some time in February 2016," [Filing No. 62 at 5], and that "[w]hile Pearson gives plausible reasons why the email exchange might not have been available to it even with the best litigation hold protocol, it has not described the actual protocol it followed," [Filing No. 62 at 10].  Accordingly, the Court determined that a remedy should be afforded to Ms. Barbera.  However, the Court found that Pearson did not act with the intent to deprive Ms. Barbera of the information

and, therefore, declined to impose sanctions pursuant to Fed. R. Civ. P. 37(e)(2).  Instead, the Court held that any prejudice could be cured by requiring that certain facts about the contents of the email exchange be taken as true, specifically paragraphs 1-6 of Ms. Barbera's proposed stipulations of fact, at Filing No. 49-1.  [Filing No. 62 at 13.]

On December 4, 2017, Ms. Barbera filed an Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, arguing that the Order is "clearly erroneous or is contrary to law" under Fed. R. Civ. P. 72(a).  [Filing No. 66 at 1.]  Ms. Barbera contends that the Court's holding hinges on its finding that Ms. Barbera "did not print the email exchange and give it to her lawyer" while she remained employed with Pearson.  [Filing No. 66 at 2.]  She alleges that this finding "improperly shifts the burden of preservation away from the employer" and ignores the fact that Ms. Barbera had signed a confidentiality agreement with Pearson that prevented her from printing a hard copy.  [Filing No. 66 at 2-3.]  As such, Ms. Barbera argues that the Magistrate Judge's finding should be set aside, that the jury should be instructed to take as true all paragraphs of Ms. Barbera's proposed stipulations of fact, and that the Court should consider additional sanctions under Rule 37(e)(2) for Pearson's destruction of her entire email account.  [Filing No. 66 at 8.]

Pearson responds by contending that the Magistrate Judge's Order is not clearly erroneous because Ms. Barbera "has no evidence showing Pearson destroyed any evidence – including the subject email exchange – in bad faith or with the intent to deprive her of its use in litigation." [Filing No. 68 at 3.]  Pearson additionally argues that this Court may not consider the contents of the confidentiality agreement because Ms. Barbera did not submit it in her original motion for sanctions.  [Filing No. 68 at 3.]  Even if the Court did consider the substance of the confidentiality agreement, Pearson argues that the email does not fall within its ambit because it reveals no confidential information.  [Filing No. 68 at 5.]

- 4 -

In her reply brief, Ms. Barbera reiterates her argument that the Magistrate Judge's decision was clearly erroneous because it would "inappropriately shift the burden to the employee plaintiff, in virtually *every* employment case, to predict which emails will be most important to her case (without the benefit of discovery), and print a hard copy to ensure their use in litigation." [Filing No. 69 at 5 (emphasis in original).]   In addition, Ms. Barbera urges the Court to issue harsher sanctions under Rule 37 because the Magistrate Judge's decision "failed to address the destruction of Plaintiff's entire email account." [Filing No. 69 at 5-8.]

Fed. R. Civ. P. 72(a) provides that a district judge must consider timely objections and modify or set aside any part of a magistrate judge's order that is "clearly erroneous or is contrary to law."  Clear error means that the district court may overturn a magistrate judge's ruling "only if the court is left with the definite and firm conviction that the magistrate judge made a mistake." *Pain Ctr. of SE Indiana, LLC v. Origin Healthcare Sols., LLC*, WL 6674745, at *2 (S.D. Ind. Nov. 25, 2014) (citing *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997)).  This is an "extremely deferential standard" and the district court "may not reverse the magistrate judge's decision simply because the district court judge would have come to a different conclusion." *McGuire v. Carrier Corp.*, 2010 WL 231099, at *1 (S.D. Ind. Jan. 13, 2010) (citing *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006)).

In this case, the Court is not left with the definite and firm conviction that the Magistrate Judge made a mistake in finding no evidence that Pearson acted in bad faith or with the intent to deprive Ms. Barbera of use of the email in litigation.  With regard to the confidentiality agreement, Pearson is correct in pointing out that it is impermissible for the Court to consider evidence submitted for the first time in an objection to a magistrate judge's ruling.  *See Pain Ctr.*, 2014 WL

6674745, at *2 (disregarding new evidence because defendants' assertion of such facts in an ob-

jection to a magistrate judge's ruling was "simply too late"). However, setting aside the issue of

whether the confidentiality agreement barred Ms. Barbera from retaining the email in question,

Ms. Barbera has not identified and the Court has not found any evidence showing bad faith or

intent to deprive. Accordingly, Ms. Barbera's Objection to the Magistrate Judge's Order on Plain-

tiff's Motion for Sanctions, [Filing No. 66], is **OVERRULED**. For the purposes of considering

Pearson's Motion for Summary Judgment, the Court will accept as true the facts set forth in para-

graphs 1-6 of Ms. Barbera's proposed stipulations of fact. [Filing No. 49-1.]

### III.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed in Part I.

The facts stated are not necessarily objectively true, but as the summary judgment standard re-

quires, the undisputed facts and the disputed evidence are presented in the light most favorable to

"the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American

Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

Pearson is an education publishing and assessment company that provides educational

products to pre-K-12 education, higher education, and professional customers. [Filing No. 50-3

at 2.]

During all times relevant to Ms. Barbera's case, the following individuals were employed

by Pearson: Deborah Freeman, also known as Debbie Lindsay, was the Director of Human Re-

sources, [Filing No. 51 at 23-24]; Michael Nathanson was the Senior Vice President of Distribu-

tion, Customer Services, and Transportation, [Filing No. 50-5 at 2]; Michael Scheuring was the

Director of Inventory, [Filing No. 50-3 at 2]; and Laura Dwyer served as a Manager of Business

Analysis at Pearson's Cranbury facility, [Filing No. 51 at 15]. Meanwhile, Andrew Wallace was

- 6 -

in charge of the programming staff and Mike Nicholson was in charge of networking, with neither having responsibility for a specific facility.  [Filing No. 51 at 15.]

Ms. Barbera began working for Pearson in 1989.  [Filing No. 51 at 6.]  She is a graduate of North Texas State University, now known as the University of North Texas, where she earned a Bachelor's degree in Music, and Indiana University, where she earned a Master's of Business Administration in finance.  [Filing No. 51 at 4.]  She describes herself as a Mensan, [Filing No. 51 at 6], and prior to becoming employed by Pearson, Ms. Barbera was employed by Eli Lilly and the First National Bank of Chicago, and worked on a temporary basis, [Filing No. 51 at 5].

Ms. Barbera was initially hired by Pearson as a Business Manager.  [Filing No. 51 at 6.]  Her subsequent roles at Pearson include Manager of Production Control, Project Lead, Business Manager of Business Systems, [Filing No. 51 at 7], and Manager of Distribution Systems.  [Filing No. 51 at 9]  At all times relevant to her case, Ms. Barbera served as Manager of Business Analysis at Pearson's Indy North facility.  [Filing No. 51 at 15.][1]

### A.  Pearson Severance Policies and Voluntary Separation Plans

On April 1, 2007, Pearson issued a severance policy (the "Severance Policy") that applied to all full time employees.  [Filing No. 50-4 at 6.]  The Severance Policy was subsequently revised on November 1, 2013,[2] and provided as follows:

---

[1] In her deposition, Ms. Barbera testified that titles were "thrown around loosely" at Pearson but that she would not refute that her title in 2015 and 2016 was "Manager of Business Analysis." [Filing No. 51 at 9.]  Accordingly, this is the title the Court will use.

[2] On January 1, 2015, Pearson issued a revision to the 2013 policy, which was identical in all material respects to the two portions of the 2013 policy cited herein.  [Filing No. 50-4 at 12; Filing No. 50-4 at 17.]  As such, the Court will merely refer to the "Severance Policy," with the understanding that it is referring to the appropriate policy for the period of time discussed.

> Only regular full-time and short-hour Pearson Education and NCS Pearson employees whose employment is involuntarily terminated for reasons other than cause (as defined below) are eligible to receive severance pay. Employees who leave the company voluntarily, or who are discharged for cause, will not be eligible for severance pay. Term of project, part-time, temporary, seasonal, per diem workers, freelancers, consultants and independent contractors, are not eligible to receive severance pay.

[Filing No. 50-4 at 6.]  In addition, the Severance Policy provided that:

> ### Severance as a Result of Merger/Acquisition
>
> Notwithstanding any other provision of this Policy, no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger, consolidation, liquidation, dissolution or any other transaction when such employee is offered employment by the purchaser or another employer in connection with the transaction, regardless of whether the position offered is comparable to the employee's current position or is accepted by the employee.

[Filing No. 50-4 at 11.]

In or around 2013, Pearson began to reduce the size and scope of its warehouses in order to transition from the print business to digital products.  [Filing No. 50-4 at 3.]  To that end, Pearson issued a Voluntary Separation Plan on July 8, 2013 (the "2013 VSP") in order to reduce the number of management positions by offering "financial incentives for eligible employees to voluntarily separate from service with the company."  [Filing No. 50-4 at 18.]  The 2013 VSP was not offered to employees who submitted notice of their resignation prior to the effective date, or to employees who worked in the finance or systems departments.  [Filing No. 50-4 at 18.]  The 2013 VSP provided for the following plan benefit:

- Lump Sum Payment 2 weeks of pay for every full year of service to the company (max. of 26 weeks)Additional month of pay (transition bonus) as an incentive to participate and defray retraining costs
- For eligible employees, pro-rated incentive pay for 2013
- Pro-rated 2013 vacation

[Filing No. 50-4 at 19.]  In order to take advantage of the 2013 VSP, employees were required to notify Debbie Freeman prior to August 19, 2013.  [Filing No. 50-4 at 19.]

The next year, Pearson announced that its Indy North and Lebanon distribution centers would be consolidated, and the company again offered a Voluntary Severance Program and Attendance Bonus (the "2014 VSP").  [Filing No. 50-4 at 23.]  The 2014 VSP provided that salary and benefits continuation would be determined in accordance with the Severance Policy and stated that the systems and transportation departments were ineligible to participate in the program.  [Filing No. 50-4 at 23.]  In order to opt in, the 2014 VSP provided as follows:

> Eligible employees interested in the plan must complete the attached form and return it to the Human Resources Department during the election period.  The election period begins 2/17/14 and ends 2/28/14. Applications received after the 2/28/14 deadline will not be eligible.

[Filing No. 50-4 at 23.]  Approximately 180 employees opted into the 2013 VSP and the 2014 VSP, including 80 employees who were female.  [Filing No. 50-5 at 2; Filing No. 50-4 at 3.]

At various points, Ms. Barbera spoke with Ms. Freeman about whether severance would be available if Ms. Barbera chose to leave.  [Filing No. 51 at 27.]  At some point after the 2014 VSP was offered, Ms. Barbera had a conversation with Mr. Scheuring about the 2014 VSP; during that conversation, Mr. Scheuring made no assurances but represented that another VSP could come along in January 2015.  [Filing No. 51 at 27.]

**B.  Individuals who Received Severance Outside of the 2013 and 2014 VSP Periods**

A handful of individuals left Pearson's employ outside of the windows of time set forth in the 2013 VSP and the 2014 VSP and received severance benefits.

In September 2014, Paul Zale, who was the Director of Engineering at Pearson, left his job and received severance benefits.  [Filing No. 50-4 at 3-4.]  Earlier, in August 2014, Mr. Zale approached his supervisor Steve Wenz and asked if there was any possibility of severance.  [Filing No. 50-2 at 2.]   Mr. Zale was paid severance in the amount of two weeks for each year of service to Pearson, along with continued medical coverage through April 2015.  [Filing No. 50-2 at 3.]

- 9 -

The terms of his separation were summarized in a letter dated September 3, 2014, signed by Debbie Freeman, which stated that severance would be paid in accordance with the Severance Policy. [Filing No. 50-2 at 4-5.] Mr. Zale's departure was unrelated to any transaction between Pearson and another entity. [Filing No. 50-4 at 4.]

In March 2015, Director of Operations Deborah Petra left her employment at Pearson because her position was eliminated and received severance benefits. [Filing No. 50-4 at 4.]

On April 17, 2015, Tony Ramsey, who was the Information Technology System Administrator at Pearson, left his job and received severance benefits. [Filing No. 50-2 at 6; Filing No. 50-5 at 2.] Ms. Barbera and Mr. Ramsey worked in the same department but reported to different supervisors, with Ms. Barbera reporting to Mr. Scheuring and Mr. Ramsey reporting to Mike Nicholson. [Filing No. 50-2 at 6.] Earlier, in April 2015, Mr. Ramsey approached Ms. Freeman and asked if there was any possibility of severance. [Filing No. 50-2 at 6.] Mr. Ramsey was paid severance in the amount of two weeks for each year of service to Pearson, along with continued medical coverage for 18 months following his separation. [Filing No. 50-2 at 7.] The terms of his separation were summarized in a letter dated April 17, 2015, signed by Debbie Freeman, which stated that severance would be paid in accordance with the Severance Policy. [Filing No. 50-2 at 9-13.] Mr. Ramsey's departure was unrelated to any transaction between Pearson and another entity. [Filing No. 50-5 at 2.]

In June 2015, Thomas Lukasik, who worked as a Key Account Manager at Pearson, left his job and received severance benefits. [Filing No. 50-2 at 21-22; Filing No. 50-5 at 2; Filing No. 51 at 25.] Prior to his departure, Mr. Lukasik's supervisor was Director of Operations Anthony Clark. [Filing No. 50-2 at 21.] In March 2015, Mr. Lukasik asked Mr. Nathanson if Pearson was going to do another round of budget reduction and Mr. Nathanson advised him to speak to Ms.

Freeman. [Filing No. 50-2 at 21.] At some time between the end of March and the middle of April 2015, Mr. Lukasik asked Ms. Freeman about the severance pay process. [Filing No. 50-2 at 22.] In June, Mr. Lukasik left his job at Pearson and was paid two weeks of salary for every year of service at Pearson, and medical coverage through September 2015. [Filing No. 50-2 at 22.] Mr. Mr. Lukasik's exit from Pearson was unrelated to any transaction with another entity. [Filing No. 50-5 at 2.]

### C. Pearson's Transaction with R.R Donnelley

In late-July 2014, Pearson sent out a Request for Proposal ("RFP") seeking proposals from companies to operate Pearson's end-to-end print supply chain in North America. [Filing No. 50-3 at 3.] R.R. Donnelley was among the companies to respond to the RFP. [Filing No. 50-3 at 3.]

In summer 2015, Pearson decided to transfer its warehouses, print, manufacturing, paper procurement, and supporting services to R.R. Donnelley, and provided R.R. Donnelley with a list of individuals employed at Pearson's warehouses. [Filing No. 50-3 at 3.] In July 2015, Mr. Scheuring, who supervised Ms. Barbera and others, provided R.R. Donnelley with ratings detailing his team's skills in order to assist R.R. Donnelley with making placement decisions within its organization. [Filing No. 50-3 at 3.] Regarding Ms. Barbera, Mr. Scheuring wrote:

> Vicki is the top Log Pro Analyst with the most broad understanding of the various businesses at Pearson. She is very strong in APC and TMS with a good knowledge of WMS. She also is has most knowledge of Connections and Assessments

[Filing No. 50-3 at 10.]

In August 2015, Mr. Scheuring exchanged several emails with Jeff Eisentraut, who was the Vice President of Information Technology at R.R. Donnelley. [Filing No. 50-3 at 11-14.] On August 20, 2015, Mr. Eisentraut asked Mr. Scheuring if he would consider Ms. Barbera and two other Pearson employees "super users." [Filing No. 50-3 at 14.] The next day, Mr. Eisentraut

again wrote to Mr. Scheuring concerning Ms. Barbera and the same two Pearson employees, this time stating:

> Based on the helpful information you provided I am viewing the above folks as super users – and that they really do no have any RPG or programming skills to go in and modify source code.  Hence it would probably make most sense that they would report up to the business and John Ramich vs. being part of Andrew Wallace and team reporting up to me in IT -  would you concur?

[Filing No. 50-3 at 12.]  Mr. Scheuring responded as follows:

> Your assumption on Richard is correct.  However I would categorize Laura and Vicki as more than super users. Instead  I would call them system analysts.  True they do not write RPG programs but they have technical capability.  For example they both have mapped interfaces, participated in detailed program designs and have deep understanding of how Log Pro functions.  Also both have headed up full warehouse implementations.

[Filing No. 50-3 at 11.]  Mr. Scheuring ended his email with, "I hope that helps," to which Mr. Eisentraut replied, "Yes that does – I could use folks like Laura [Dwyer] and Vicki [Barbera] as there will be plenty of mapping/interface work coming down the pipe in the next 2 years." [Filing No. 50-3 at 11.]

On or around September 15, 2015, Mr. Scheuring, Ms. Barbera's supervisor, informed her that he would be asking her for data for quite some time because a transition was going to occur. [Filing No. 50-3 at 4; Filing No. 51 at 14; Filing No. 51 at 40.]  Along with Ms. Barbera, Mike Nicholson and Laura Dwyer were also asked to gather data related to the transition.  [Filing No. 51 at 14.]  Thereafter, Mr. Scheuring would ask Ms. Barbera questions pertaining to specific data. [Filing No. 51 at 14.]

Around the same time, Mr. Scheuring began referring R.R. Donnelley to Mr. Wallace for technical questions that involved the intricacies of programming, applications, and hardware because of Mr. Wallace's expertise in that area.  [Filing No. 50-3 at 5.]  Meanwhile, Mr. Wallace came to Ms. Barbera to ask her questions regarding how certain things worked.  [Filing No. 51 at 14-15.]  Mr. Wallace would communicate information that he obtained to R.R. Donnelley at their

request.  [Filing No. 51 at 16.]  Ms. Barbera never asked anyone on Pearson's management team why Mr. Wallace was performing this function instead of her.  [Filing No. 51 at 16.]  Mr. Wallace attended meetings related to this function on a weekly or biweekly basis.  [Filing No. 51 at 14.]  Those meetings were attended by Jeff Eisentraut, Mike Nicholson, and others.  [Filing No. 51 at 15.]

On October 13, 2015, Pearson signed a contract governing the transfer of warehouses, print, manufacturing, paper procurement, and supporting services to R.R. Donnelley.  [Filing No. 50-3 at 3.]

In mid-January 2016, Pearson held a meeting to inform individuals who worked at Pearson's Indy North facility – including Ms. Barbera – that the facility and distribution operations would be transferred to R.R. Donnelley.  [Filing No. 51 at 10.]  At the meeting it was revealed that the majority of the employees would have the opportunity to "rebadge" by being offered a position with R.R. Donnelley and that their salaries and employment would be guaranteed for six months.  [Filing No. 51 at 10.]  This transaction affected approximately 700 employees, both male and female, who were informed that their employment with Pearson would be terminated on February 29, 2016.  [Filing No. 50-3 at 3.]

Along with information conveyed at the January 2016 meeting, Pearson employees were given a Frequently Asked Questions ("FAQ") memorandum.  [Filing No. 50-3 at 3-4.]  One question and answer in the FAQ memorandum dealt with severance:

> **If I choose to leave Pearson before the transition to RRD, will I receive a severance package? Employees are not eligible for severance who opt to resign rather than transition to RR Donnelley.**

[Filing No. 50-3 at 7.]

Ms. Barbera sent an email to Michael Nathanson, Pearson's Senior Vice President of Distribution, in January of 2016, around the time of the formal announcement of Pearson's transaction with R.R. Donnelley.  [Filing No. 49-1 at 2.][3]  Ms. Barbera also copied this email to Michael Scheuring, Pearson's Director of Supply Chain.  [Filing No. 49-1 at 2.]  Ms. Barbera's email message asked Mr. Nathanson whether she could receive severance pay rather than rebadging over to R.R. Donnelley, and stated that she would be happy to extend her employment long enough to help in the transition, but that she did want to leave.  [Filing No. 49-1 at 2.]  Mr. Nathanson responded within one workday by denying Ms. Barbera's request for severance pay, and stating that if she had wanted to exit with severance, she would have had to have asked for it within the deadline for the 2014 VSP.  [Filing No. 49-1 at 2.]  Ms. Barbera interpreted Mr. Nathanson's email as a reference to the Pearson Voluntary Severance Pay policy dated February 1, 2014.  [Filing No. 49-1 at 2.]  Mr. Nathanson's reply email to Ms. Barbera did not say anything about the R.R. Donnelley outsourcing or transaction being the reason why he was denying her request for severance. [Filing No. 49-1 at 3.]  Mr. Nathanson's reply email to Ms. Barbera did not say anything about "rebadging" being the reason why he was denying her request for severance.  [Filing No. 49-1 at 3.]

On February 18, 2016, Daniel Lennon wrote a letter to Ms. Barbera's counsel in response to correspondence dated February 8, 2016, which provided as follows:

---

[3] The facts set forth in this paragraph are taken as true pursuant to the Court's Order at Filing No. 62.

> Pearson acknowledges and is grateful for the many years of service Ms. Barbera provided the Company. It recognizes her accomplishments and appreciates all of them. However, per the clear language of the Company's severance policy, Ms. Barbera is not entitled to severance.
>
> Attached hereto as Exhibit 1 is a copy of Pearson's Severance Policy. The fifth paragraph under the "Policy" section states that, "Severance pay will not be paid to employees whose termination is the result of a merger or acquisition", as set forth in detail in the section titled "Severance as a Result of a Merger/Acquisition" of this policy. Under the "Severance as a Result of Merger/Acquisition" section of the policy, it clearly states that no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger....or any other transaction when such employee is offered employment by the purchaser or another employer in connection with the transaction...". That is exactly what occurred in Ms. Barbera's case. She is to be offered employment by R.R. Donnelly effective February 29, 2016 and therefore is not entitled to severance.

[Filing No. 49-6 at 2.]

R.R. Donnelley offered Ms. Barbera the same position she had held at Pearson – Manager of Business Analysis – at the North Indy facility, which would have taken effect March 1, 2016. [Filing No. 51 at 12.] Ms. Barbera refused this employment offer and communicated this refusal to R.R. Donnelley by not showing up for work on March 1, 2016. [Filing No. 51 at 12.] She later verified that she had refused R.R. Donnelley's employment offer over the telephone to Andrew Wallace after he called to inquire. [Filing No. 51 at 12.]

After Ms. Barbera's employment at Pearson ended, she made no attempts to seek new employment. [Filing No. 51 at 6.] Ms. Barbera has not earned any income since February 29, 2016. [Filing No. 51 at 32.]

### D. The Lawsuit

Ms. Barbera initiated this lawsuit on September 23, 2016, and filed the operative Amended Complaint on February 15, 2017. [Filing No. 1; Filing No. 24.] Pearson has moved for summary judgment, [Filing No. 50], and that motion is now ripe for the Court's decision.

# IV.

## DISCUSSION

### A.  Sex Discrimination Claim

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) (citing 42 U.S.C. § 2000e-2(a)(1)).  "To survive summary judgment on a Title VII discrimination claim, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Milligan-Grimstad v. Stanley*, __ F.3d __, 2017 WL 6276198, at *2 (7th Cir. Dec. 11, 2017) (quotation omitted).

This Court's analysis of Ms. Barbera's Title VII claim comes nearly a year and a half after the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).  Since that time, the Court of Appeals has had numerous opportunities to explain and apply *Ortiz* in a variety of employment contexts, and it is to this body of law that the Court now turns.  *Ortiz* "discarded the long-standing practice of distinguishing between 'direct' and 'indirect' evidence in analyzing discrimination claims." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017) (citation omitted).  Now, instead of separating evidence under different methods of proof, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cty., Illinois,* 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz,* 834 F.3d at 765).  In determining whether the evidence would permit a reasonable factfinder to conclude that Ms. Barbera's sex caused her to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and

assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Both Pearson and Ms. Barbera organize their arguments in terms of the *McDonnell Douglas* framework and the Court will follow suit.  This familiar framework requires Ms. Barbera to show that: (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment.  *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017).  If Ms. Barbera makes this prima facie showing, the burden shifts to Pearson to come forward with a legitimate, nondiscriminatory reason for the challenged employment action.  *Id.*  If Pearson does this, then the burden shifts back to Ms. Barbera to produce evidence establishing a genuine dispute of fact about whether Pearson's reason was a pretext for discrimination.  *Id.*

Ms. Barbera argues that Pearson discriminated against her in two ways:  (1) by denying her severance; and (2) by denying her a role as an information technology liaison during the transition to R.R. Donnelley.

### 1.  The Denial of Severance

Turning to the first issue, Pearson alleges that "*all* employees affected by Pearson's transaction with R.R. Donnelley – male and female" – were treated the same.  [Filing No. 52 at 13 (emphasis in original).]  Pearson additionally argues that Ms. Barbera cannot show that she was treated differently than the three male colleagues she identified because those individuals were not similarly situated.  [Filing No. 52 at 13-14.]

- 17 -

In response, Ms. Barbera argues that she met her initial burden regarding her sex discrim-ination claim by showing that: "(1) she is female; (2) she was receiving 'outstanding' performance evaluations; (3) she suffered an adverse employment action in that she was denied severance pay when she requested it, and (4) three male colleagues were treated more favorably . . . in that they were granted severance pay when they were ineligible under the explicit terms of the plan." [Filing No. 60 at 12.]

In its reply brief, Pearson reiterates that Ms. Barbera's alleged comparators received sev-erance under "completely different circumstances" than existed at the time of her requests for sev-erance because her requests implicated Pearson's severance policy provision while the alleged comparators' requests did not. [Filing No. 61 at 3-4.]

In identifying one or more similarly situated individuals outside her protected class who received better treatment, Ms. Barbera must submit evidence that she and the similarly situated male employees "reported to the same supervisor, engaged in the same conduct, and had the same qualifications," and that "there were no 'differentiating or mitigating circumstances as would dis-tinguish . . . the employer's treatment of them.'" *Johnson v. Chicago Transit Auth.*, 699 F. App'x 558, 559 (7th Cir. 2017) (citations omitted).

Ms. Barbera identifies three men who received severance outside the periods of time con-templated in the 2013 VSP and the 2014 VSP:  Paul Zale, Tony Ramsey, and Thomas Lukasik. The record indicates that each of these individuals reported to different supervisors,[4] and is largely

---

[4] While Ms. Barbera reported to Michael Scheuring, [Filing No. 50-2 at 6,] Mr. Zale reported to Steve Wenz, [Filing No. 50-2 at 2], Mr. Ramsey reported to Mike Nicholson, [Filing No. 50-2 at 6], and Mr. Lukasik reported to Anthony Clark, [Filing No. 50-2 at 21].

silent on the individuals' various qualifications.  That said, "the similarly situated analysis is flexible, and the result depends on any relevant factors and common sense."  *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 538 (7th Cir. 2013).  The Court will, therefore, look past unduly technical distinctions among the individuals.

The problem with Ms. Barbera's reliance on these individuals as comparators is that they left Pearson in September 2014, April 2015, and June 2015, respectively – well before Ms. Barbera alleges she made her first severance request "sometime in the later part of 2015."[5]  [Filing No. 60 at 4.] The distinction in the timing of the requests is significant given the evidence that the situation at Pearson evolved significantly over the course of 2015.  The record indicates, for example, that in July 2015, Mr. Scheuring began providing R.R. Donnelley with ratings detailing his team's skills in order to assist R.R. Donnelley with making placement decisions within its organization. [Filing No. 50-3 at 3; Filing No. 50-3 at 10.] By September, Mr. Scheuring informed Ms. Barbera that he would be asking her for data because a transition was going to occur.  [Filing No. 51 at 14; Filing No. 51 at 40.] And on October 13, 2015, Pearson signed a contract governing the transfer of warehouses, print, manufacturing, paper procurement, and supporting services to R.R. Donnelley.  [Filing No. 50-3 at 3.] There existed, therefore, a major differentiating or mitigating circumstance that distinguishes Pearson's treatment of individuals who requested severance in late 2014 and early 2015 from Ms. Barbera who requested severance, at the earliest, in the latter half of 2015. In short, Pearson's impending transaction with R.R. Donnelley with the promise of continued to

---

[5] The Court notes that Ms. Barbera contends in her response brief that "there is no evidence in the record to indicate" whether Ms. Barbera made three alleged requests for severance "before or after September, 2015."  [Filing No. 60 at 14 n.3.]  The only evidence of these requests consists of Ms. Barbera's deposition testimony on the subject.  However, the burden of identifying similarly situated individuals falls on Ms. Barbera.  At no point does Ms. Barbera allege, let alone show, that she made requests for severance in the same period of time as Mr. Zale, Mr. Ramsey, or Mr. Lukasik.

employment to individuals such as Ms. Barbera, constitutes a differentiating circumstance, such that the individuals identified by Ms. Barbera are not similarly situated.

This differentiating circumstance is also demonstrated by the Severance Policy, which provides that "no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger, consolidation, liquidation, dissolution, or any other transaction when such employee is offered employment by . . . another employer in connection with the transaction." [Filing No. 50-4 at 11.]    Neither Mr. Zale, nor Mr. Ramsey, nor Mr. Lukasik were offered employment by another employer under the terms of the Severance Policy.  [Filing No. 50-4 at 4; Filing No. 50-5 at 2.] Nor is there any evidence that any of Ms. Barbera's proposed comparators would have been given a job by R.R. Donnelley after its transaction with Pearson.  Ms. Barbera, however, was offered the same position she had held at Pearson – Manager of Business Analysis – at the North Indy facility with R.R. Donnelley, which would have taken effect March 1, 2016.  [Filing No. 51 at 12.]  She was one of approximately 700 employees, both male and female, who were informed that their employment with Pearson would be terminated on February 29, 2016.  [Filing No. 50-3 at 3.]  Had Pearson offered Ms. Barbera severance in January or February 2016, it would have been treating her differently than the 700 other individuals who were offered new jobs with R.R. Donnelley, none of whom were eligible for severance under the terms of the Severance Policy.

Likewise, there is no evidence that there were any similarly situated male employees – meaning employees who left Pearson's employ after July 2015 – who were offered positions with R. R. Donnelly and were also offered severance.  Indeed, Ms. Barbera's own deposition testimony establishes that no male employee of the Indy North distribution center whose employment terminated on the same day as Ms. Barbera's was offered severance pay from Pearson, [Filing No. 51 at 28], and that the sale to R.R. Donnelley affected Ms. Barbera and other managers of business

analysis – male and female – in the same way, [Filing No. 51 at 10].  Ms. Barbera was not similarly situated to her proposed comparators; she was similarly situated to hundreds of employees who were offered new jobs with R.R. Donnelley, and the evidence shows that she was similarly treated to them.

Having failed to meet her burden under *McDonnell Douglas*, the Court need not proceed to analyze Ms. Barbera's allegations regarding severance under the burden shifting method.  Instead, returning to the guidance set forth in *Ortiz*, Ms. Barbera's failure to meet her burden under *McDonnell-Douglas* demonstrates that there is insufficient evidence, when taken as a whole, to permit a reasonable factfinder to conclude that Ms. Barbera was denied severance because of her sex.

Although Ms. Barbera has not set forth a prima facie case of sex discrimination, the Court will briefly consider the issue of pretext.  To show pretext, Ms. Barbera must establish that a "phony reason (not just an unfounded one)" was given for her the denial of severance.  *Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (citing *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013); *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)). Such an inquiry requires this Court to "evaluate the honesty of the employer's explanation, rather than its validity or reasonableness."  *Hill*, 724 F.3d at 968 (citations omitted).  Ms. Barbera alleges that she made two requests for severance in early 2016, each of which she contends were denied under a false pretext.  [Filing No. 60 at 15-18.]  As to Ms. Barbera's request in January 2016, Mr. Nathanson responded by stating "that if she had wanted to exit with severance, she would have had to have asked for it within the deadline for the 2014 Voluntary Severance Program ("VSP")." [Filing No. 49-1 at 2.]  As to her request in February 2016, Mr. Lennon responded by stating that Ms. Barbera was not entitled to severance "per the clear language" of the Severance Policy because

she was being offered employment by R.R. Donnelley.  [Filing No. 49-6 at 2.]  Nothing in the record suggests that either of those reasons were proffered by Pearson in order to mask unlawful discrimination or that Pearson lied about its reasons for not offering Ms. Barbera severance.  Ms. Barbera may believe that Pearson's reasons for denying her severance in January and February 2016 were unfounded, but she has not met her burden of proving by a preponderance of the evidence that the reasons were pretext for discrimination.

### 2.  *The Denial of an Information Technology Role*

Turning next to Ms. Barbera's contention that she was denied a specific role during the transition to R.R. Donnelley, Pearson alleges that it cannot be held responsible for denying her an "Information Technology contact position" because it did not create any such position - R.R. Donnelley did.  [Filing No. 52 at 13.]

Ms. Barbera contends that Pearson is responsible for denying her an information technology liaison role at R.R. Donnelley under the "cat's paw" theory, wherein an employer is liable for tainting or influencing an independent decision maker with the employer's illegal motives.  [Filing No. 60 at 18.]  Specifically, she alleges "[a]lthough Mr. Scheuring was not technically the final decisionmaker" about what position to offer her at R.R. Donnelley, "it is clear that R.R. Donnelley was relying heavily on Mr. Scheuring's recommendations in making its decision," and that she "has raised a sufficient issue of fact for a jury to decide whether Pearson should have placed her in the IT liaison role."  [Filing No. 60 at 19.]

Pearson responds that failing to place Ms. Barbera in a position that did not exist is not an adverse employment action under Title VII.  [Filing No. 61 at 12.]  Moreover, Pearson contends that Ms. Barbera's cat's paw theory "simply does not make sense."  [Filing No. 61 at 13.]  Finally,

Pearson argues that there is simply no evidence that Mr. Scheuring has any discriminatory animus toward Ms. Barbera.  [Filing No. 61 at 13.]

The "cat's paw" theory that Ms. Barbera presents provides that courts may find direct evidence of discrimination where "a biased subordinate" who lacks decision making power to fire an employee "uses a formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citations and quotations omitted).  Applying the cat's paw theory to the case at hand is inapposite at each turn.  First, Ms. Barbera's "biased subordinate" is, in fact, not a subordinate at all, let alone one who lacked decision making power.  To the contrary, Mr. Scheuring was Ms. Barbera's direct supervisor.  [Filing No. 50-2 at 6.]  Second, the employer that Ms. Barbera seeks to hold liable – Pearson – is not the entity that Ms. Barbera claims was used to trigger a discriminatory employment action by a biased subordinate.  In her response brief, she specifically alleges that "it is clear that R.R. Donnelley was relying heavily on Mr. Scheuring's recommendations in making its decision." [Filing No. 60 at 19.]  But R.R. Donnelley can incur liability for sex discrimination only if Ms. Barbera can "prove the existence of an employer-employee relationship" with R.R. Donnelley.  *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017) (quoting *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015)).  In this case, Ms. Barbera was never an employee of R.R. Donnelley, having refused its employment offer by not showing up for work on March 1, 2016.  [Filing No. 51 at 12.]  Even if the facts of this case could be shoehorned into the cat's paw theory, there is no evidence in the record that Mr. Scheuring harbored a discriminatory animus toward Ms. Barbera.  Quite the opposite is true.  The record contains evidence that Mr. Scheuring informed R.R. Donnelley that Ms. Barbera was "very strong" with "a good knowledge" of systems and the "most knowledge" of connections and assessments,

[Filing No. 50-3 at 10], that she was "more than a superuser" and had a "deep knowledge" of certain company functions, [Filing No. 50-3 at 11].  For these reasons, the Court finds that there is insufficient evidence to draw any conclusion of discrimination under the cat's paw theory.

Ms. Barbera has not set forth a prima facie case of sex discrimination related to the denial of severance or the denial of any role with R.R. Donnelley.  Accordingly, her sex discrimination claim fails as a matter of law, and Pearson is entitled to summary judgment on that claim.[6]

### B.  Equal Pay Act Claim

Nearly five months after filing her complaint, Ms. Barbera filed an Amended Complaint adding a cause of action pursuant to the Equal Pay Act.  [Filing No. 24.]  In its Motion for Summary Judgment, Pearson argues that Ms. Barbera's Equal Pay Act claim fails because "Pearson had a gender-neutral justification for providing severance benefits to the three male colleagues Ms. Barbera identified: the ending of their employment occurred under wholly different circumstances not

---

[6] Although Ms. Barbera's Title VII claim fails as a matter of law on its merits, the Court will briefly address Ms. Barbera's efforts to mitigate her damages consistent with the Circuit's "longstanding" and "repeatedly reaffirmed" framework for evaluating mitigation questions. *Stragapede v. City of Evanston, Illinois*, 865 F.3d 861, 868 (7th Cir. 2017).  To prove a failure to mitigate in this context, the Pearson must show that (1) Ms. Barbera failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that she might have found comparable work by exercising reasonable diligence.  *Id.* at 868 (quoting *Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir. 1990)).

Here, notwithstanding her unsuccessful efforts to earn an income by day trading, the evidence establishes that Ms. Barbera turned down a guaranteed six months at her Pearson salary, [Filing No. 51 at 12], made no attempts to seek new employment, [Filing No. 51 at 6], and has not earned any income since February 29, 2016, [Filing No. 51 at 32].  Given these facts, and considering Ms. Barbera's considerable educational background and work experience, it is all but established that she failed to mitigate her damages.  *See, e.g., Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771-72 (7th Cir. 2006) (finding a failure to mitigate where a plaintiff with "vast experience plus an educational background that includes a master's degree in biomedical engineering" contacted 23 firms without success).  However, having decided the case on the grounds that Ms. Barbera has not set forth a prima facie case of sex discrimination, the Court need not make a specific finding on this issue.

applicable to Ms. Barbera when she finally expressed her desire to leave Pearson voluntarily." [Filing No. 52 at 25.]  In response, Ms. Barbera makes no specific arguments regarding her Equal Pay Act claim.  [Filing No. 60.]  In its reply brief, Pearson notes that Ms. Barbera does not distinguish between her Title VII and Equal Pay Act claims, and it accordingly addresses such claims together in its reply.  [Filing No. 61 at 2.]

The Equal Pay Act prohibits an employer from discriminating between employees on the basis of sex.  29 U.S.C. § 206(d)(1).  "To establish a prima facie cause of action under the Act, an employee must demonstrate a difference in pay for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Lauderdale v. Illinois Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (citation and quotation omitted).  The Act provides four affirmative defenses by which the employer can claim the discrepancy is not discriminatory: "where . . . payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* at 907 (quoting 29 U.S.C. § 206(d)(1)).  "An employer asserting that the difference is the result of a 'factor other than sex' must present this contention as an affirmative defense—and the proponent of an affirmative defense has the burdens of both production and persuasion." *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012).

Ms. Barbera fails to mention the Equal Pay Act in her response to Pearson's Motion for Summary Judgment and otherwise fails to set forth a prima facie cause of action under the Act. However, even if the Court were to infer that Mr. Zale, Mr. Ramsey, and Mr. Lukasik are the relevant comparators for the purposes of Ms. Barbera's Equal Pay Act claim, this claim fails for the same reason that her Title VII claim fails.  Even assuming *arguendo* that Ms. Barbera was able

to demonstrate a prima facie cause of action under the Equal Pay Act, the three individuals she identifies as having been similarly situated left Pearson before the company began its transition with R.R. Donnelley.  [Filing No. 50-3 at 3; Filing No. 50-3 at 10.]  Just as this distinction in timing constitutes a "mitigating circumstance" under Title VII, it also proves to be a "differential based on a factor other than sex" under the Equal Pay Act.   As such, Ms. Barbera's Equal Pay Act claim fails as a matter of law, and Pearson is entitled to summary judgment on that claim.

## V.
### CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, [66], and **GRANTS** Pearson's Motion for Summary Judgment, [50].  Final judgment shall enter accordingly.

Date: 12/28/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

- 26 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VICKI BARBERA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | No. 1:16-cv-2533-JMS-DML |
| | ) | |
| PEARSON EDUCATION, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORDER

Plaintiff Vicki Barbera, who is female, worked for Defendant Pearson Education, Inc.

("Pearson"), an education publishing company, for 27 years.  During her tenure, Ms. Barbera

worked in a variety of roles, most recently as a Manager of Business Analysis.  In January 2016,

Pearson announced that 700 warehouse employees – including Ms. Barbera – would no longer be

employed by Pearson but would, instead, be employed by R.R. Donnelley & Sons Company ("R.R.

Donnelley").  After Ms. Barbera declined to accept a job offer from R.R. Donnelley, she brought

this lawsuit against Pearson alleging sex discrimination and a violation of the Equal Pay Act.  Pear-

son moved for summary judgment, [Filing No. 50], and that motion is now ripe for the Court's

review.  In addition, Ms. Barbera filed an Objection to the Magistrate Judge's Order on Plaintiff's

Motion for Sanctions, [Filing No. 66], which the Court will also consider herein.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### EVIDENTIARY MATTERS

Before setting forth the facts in this case, the Court will first consider Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions.  [Filing No. 66 (objecting to Filing No. 62).]

On November 22, 2017, the Magistrate Judge assigned to this case issued an Order on Plaintiff's Motion for Sanctions.  [Filing No. 62 (granting in part and denying in part Filing No. 48)].  The main point of contention concerned an email Ms. Barbera alleges she sent to Michael Nathanson, Pearson's Senior Vice President of Distribution, in January 2016.  [Filing No. 62 at 3.] During discovery, Pearson did not produce Ms. Barbera's email exchange with Mr. Nathanson. [Filing No. 62 at 5.]  The Magistate Judge found that "[t]he record before the court shows that Pearson should reasonably have anticipated litigation involving Ms. Barbera and the denial of severance pay some time in February 2016," [Filing No. 62 at 5], and that "[w]hile Pearson gives plausible reasons why the email exchange might not have been available to it even with the best litigation hold protocol, it has not described the actual protocol it followed," [Filing No. 62 at 10]. Accordingly, the Court determined that a remedy should be afforded to Ms. Barbera.  However, the Court found that Pearson did not act with the intent to deprive Ms. Barbera of the information

and, therefore, declined to impose sanctions pursuant to Fed. R. Civ. P. 37(e)(2).  Instead, the Court held that any prejudice could be cured by requiring that certain facts about the contents of the email exchange be taken as true, specifically paragraphs 1-6 of Ms. Barbera's proposed stipulations of fact, at Filing No. 49-1.  [Filing No. 62 at 13.]

On December 4, 2017, Ms. Barbera filed an Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, arguing that the Order is "clearly erroneous or is contrary to law" under Fed. R. Civ. P. 72(a).  [Filing No. 66 at 1.]  Ms. Barbera contends that the Court's holding hinges on its finding that Ms. Barbera "did not print the email exchange and give it to her lawyer" while she remained employed with Pearson.  [Filing No. 66 at 2.]  She alleges that this finding "improperly shifts the burden of preservation away from the employer" and ignores the fact that Ms. Barbera had signed a confidentiality agreement with Pearson that prevented her from printing a hard copy.  [Filing No. 66 at 2-3.]  As such, Ms. Barbera argues that the Magistrate Judge's finding should be set aside, that the jury should be instructed to take as true all paragraphs of Ms. Barbera's proposed stipulations of fact, and that the Court should consider additional sanctions under Rule 37(e)(2) for Pearson's destruction of her entire email account.  [Filing No. 66 at 8.]

Pearson responds by contending that the Magistrate Judge's Order is not clearly erroneous because Ms. Barbera "has no evidence showing Pearson destroyed any evidence – including the subject email exchange – in bad faith or with the intent to deprive her of its use in litigation." [Filing No. 68 at 3.]  Pearson additionally argues that this Court may not consider the contents of the confidentiality agreement because Ms. Barbera did not submit it in her original motion for sanctions.  [Filing No. 68 at 3.]  Even if the Court did consider the substance of the confidentiality agreement, Pearson argues that the email does not fall within its ambit because it reveals no confidential information.  [Filing No. 68 at 5.]

- 4 -

In her reply brief, Ms. Barbera reiterates her argument that the Magistrate Judge's decision was clearly erroneous because it would "inappropriately shift the burden to the employee plaintiff, in virtually *every* employment case, to predict which emails will be most important to her case (without the benefit of discovery), and print a hard copy to ensure their use in litigation." [Filing No. 69 at 5 (emphasis in original).]   In addition, Ms. Barbera urges the Court to issue harsher sanctions under Rule 37 because the Magistrate Judge's decision "failed to address the destruction of Plaintiff's entire email account." [Filing No. 69 at 5-8.]

Fed. R. Civ. P. 72(a) provides that a district judge must consider timely objections and modify or set aside any part of a magistrate judge's order that is "clearly erroneous or is contrary to law."   Clear error means that the district court may overturn a magistrate judge's ruling "only if the court is left with the definite and firm conviction that the magistrate judge made a mistake." *Pain Ctr. of SE Indiana, LLC v. Origin Healthcare Sols., LLC*, WL 6674745, at *2 (S.D. Ind. Nov. 25, 2014) (citing *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997)).   This is an "extremely deferential standard" and the district court "may not reverse the magistrate judge's decision simply because the district court judge would have come to a different conclusion." *McGuire v. Carrier Corp.*, 2010 WL 231099, at *1 (S.D. Ind. Jan. 13, 2010) (citing *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006)).

In this case, the Court is not left with the definite and firm conviction that the Magistrate Judge made a mistake in finding no evidence that Pearson acted in bad faith or with the intent to deprive Ms. Barbera of use of the email in litigation.   With regard to the confidentiality agreement, Pearson is correct in pointing out that it is impermissible for the Court to consider evidence submitted for the first time in an objection to a magistrate judge's ruling.   *See Pain Ctr.*, 2014 WL

6674745, at *2 (disregarding new evidence because defendants' assertion of such facts in an objection to a magistrate judge's ruling was "simply too late").  However, setting aside the issue of whether the confidentiality agreement barred Ms. Barbera from retaining the email in question, Ms. Barbera has not identified and the Court has not found any evidence showing bad faith or intent to deprive.  Accordingly, Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, [Filing No. 66], is **OVERRULED**.  For the purposes of considering Pearson's Motion for Summary Judgment, the Court will accept as true the facts set forth in paragraphs 1-6 of Ms. Barbera's proposed stipulations of fact.  [Filing No. 49-1.]

### III.
#### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed in Part I. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made."  *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

Pearson is an education publishing and assessment company that provides educational products to pre-K-12 education, higher education, and professional customers.  [Filing No. 50-3 at 2.]

During all times relevant to Ms. Barbera's case, the following individuals were employed by Pearson:  Deborah Freeman, also known as Debbie Lindsay, was the Director of Human Resources, [Filing No. 51 at 23-24]; Michael Nathanson was the Senior Vice President of Distribution, Customer Services, and Transportation, [Filing No. 50-5 at 2]; Michael Scheuring was the Director of Inventory, [Filing No. 50-3 at 2]; and Laura Dwyer served as a Manager of Business Analysis at Pearson's Cranbury facility, [Filing No. 51 at 15].  Meanwhile, Andrew Wallace was

- 6 -

in charge of the programming staff and Mike Nicholson was in charge of networking, with neither having responsibility for a specific facility.  [Filing No. 51 at 15.]

Ms. Barbera began working for Pearson in 1989.  [Filing No. 51 at 6.]  She is a graduate of North Texas State University, now known as the University of North Texas, where she earned a Bachelor's degree in Music, and Indiana University, where she earned a Master's of Business Administration in finance.  [Filing No. 51 at 4.]  She describes herself as a Mensan, [Filing No. 51 at 6], and prior to becoming employed by Pearson, Ms. Barbera was employed by Eli Lilly and the First National Bank of Chicago, and worked on a temporary basis, [Filing No. 51 at 5].

Ms. Barbera was initially hired by Pearson as a Business Manager.  [Filing No. 51 at 6.]  Her subsequent roles at Pearson include Manager of Production Control, Project Lead, Business Manager of Business Systems, [Filing No. 51 at 7], and Manager of Distribution Systems.  [Filing No. 51 at 9].  At all times relevant to her case, Ms. Barbera served as Manager of Business Analysis at Pearson's Indy North facility.  [Filing No. 51 at 15.][1]

### A.  Pearson Severance Policies and Voluntary Separation Plans

On April 1, 2007, Pearson issued a severance policy (the "Severance Policy") that applied to all full time employees.  [Filing No. 50-4 at 6.]  The Severance Policy was subsequently revised on November 1, 2013,[2] and provided as follows:

---

[1] In her deposition, Ms. Barbera testified that titles were "thrown around loosely" at Pearson but that she would not refute that her title in 2015 and 2016 was "Manager of Business Analysis." [Filing No. 51 at 9.]  Accordingly, this is the title the Court will use.

[2] On January 1, 2015, Pearson issued a revision to the 2013 policy, which was identical in all material respects to the two portions of the 2013 policy cited herein.  [Filing No. 50-4 at 12; Filing No. 50-4 at 17.]  As such, the Court will merely refer to the "Severance Policy," with the understanding that it is referring to the appropriate policy for the period of time discussed.

> Only regular full-time and short-hour Pearson Education and NCS Pearson employees whose employment is involuntarily terminated for reasons other than cause (as defined below) are eligible to receive severance pay. Employees who leave the company voluntarily, or who are discharged for cause, will not be eligible for severance pay. Term of project, part-time, temporary, seasonal, per diem workers, freelancers, consultants and independent contractors, are not eligible to receive severance pay.

[Filing No. 50-4 at 6.]  In addition, the Severance Policy provided that:

> **Severance as a Result of Merger/Acquisition**
>
> Notwithstanding any other provision of this Policy, no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger, consolidation, liquidation, dissolution or any other transaction when such employee is offered employment by the purchaser or another employer in connection with the transaction, regardless of whether the position offered is comparable to the employee's current position or is accepted by the employee.

[Filing No. 50-4 at 11.]

In or around 2013, Pearson began to reduce the size and scope of its warehouses in order to transition from the print business to digital products.  [Filing No. 50-4 at 3.]  To that end, Pearson issued a Voluntary Separation Plan on July 8, 2013 (the "2013 VSP") in order to reduce the number of management positions by offering "financial incentives for eligible employees to voluntarily separate from service with the company."  [Filing No. 50-4 at 18.]  The 2013 VSP was not offered to employees who submitted notice of their resignation prior to the effective date, or to employees who worked in the finance or systems departments.  [Filing No. 50-4 at 18.]  The 2013 VSP provided for the following plan benefit:

- Lump Sum Payment 2 weeks of pay for every full year of service to the company (max. of 26 weeks)Additional month of pay (transition bonus) as an incentive to participate and defray retraining costs
- For eligible employees, pro-rated incentive pay for 2013
- Pro-rated 2013 vacation

[Filing No. 50-4 at 19.]  In order to take advantage of the 2013 VSP, employees were required to notify Debbie Freeman prior to August 19, 2013.  [Filing No. 50-4 at 19.]

The next year, Pearson announced that its Indy North and Lebanon distribution centers would be consolidated, and the company again offered a Voluntary Severance Program and Attendance Bonus (the "2014 VSP").  [Filing No. 50-4 at 23.]  The 2014 VSP provided that salary and benefits continuation would be determined in accordance with the Severance Policy and stated that the systems and transportation departments were ineligible to participate in the program.  [Filing No. 50-4 at 23.]  In order to opt in, the 2014 VSP provided as follows:

> Eligible employees interested in the plan must complete the attached form and return it to the Human Resources Department during the election period.  The election period begins 2/17/14 and ends 2/28/14. Applications received after the 2/28/14 deadline will not be eligible.

[Filing No. 50-4 at 23.]  Approximately 180 employees opted into the 2013 VSP and the 2014 VSP, including 80 employees who were female.  [Filing No. 50-5 at 2; Filing No. 50-4 at 3.]

At various points, Ms. Barbera spoke with Ms. Freeman about whether severance would be available if Ms. Barbera chose to leave.  [Filing No. 51 at 27.]  At some point after the 2014 VSP was offered, Ms. Barbera had a conversation with Mr. Scheuring about the 2014 VSP; during that conversation, Mr. Scheuring made no assurances but represented that another VSP could come along in January 2015.  [Filing No. 51 at 27.]

## B.  Individuals who Received Severance Outside of the 2013 and 2014 VSP Periods

A handful of individuals left Pearson's employ outside of the windows of time set forth in the 2013 VSP and the 2014 VSP and received severance benefits.

In September 2014, Paul Zale, who was the Director of Engineering at Pearson, left his job and received severance benefits.  [Filing No. 50-4 at 3-4.]  Earlier, in August 2014, Mr. Zale approached his supervisor Steve Wenz and asked if there was any possibility of severance.  [Filing No. 50-2 at 2.]   Mr. Zale was paid severance in the amount of two weeks for each year of service to Pearson, along with continued medical coverage through April 2015.  [Filing No. 50-2 at 3.]

The terms of his separation were summarized in a letter dated September 3, 2014, signed by Debbie Freeman, which stated that severance would be paid in accordance with the Severance Policy. [Filing No. 50-2 at 4-5.] Mr. Zale's departure was unrelated to any transaction between Pearson and another entity. [Filing No. 50-4 at 4.]

In March 2015, Director of Operations Deborah Petra left her employment at Pearson because her position was eliminated and received severance benefits. [Filing No. 50-4 at 4.]

On April 17, 2015, Tony Ramsey, who was the Information Technology System Administrator at Pearson, left his job and received severance benefits. [Filing No. 50-2 at 6; Filing No. 50-5 at 2.] Ms. Barbera and Mr. Ramsey worked in the same department but reported to different supervisors, with Ms. Barbera reporting to Mr. Scheuring and Mr. Ramsey reporting to Mike Nicholson. [Filing No. 50-2 at 6.] Earlier, in April 2015, Mr. Ramsey approached Ms. Freeman and asked if there was any possibility of severance. [Filing No. 50-2 at 6.] Mr. Ramsey was paid severance in the amount of two weeks for each year of service to Pearson, along with continued medical coverage for 18 months following his separation. [Filing No. 50-2 at 7.] The terms of his separation were summarized in a letter dated April 17, 2015, signed by Debbie Freeman, which stated that severance would be paid in accordance with the Severance Policy. [Filing No. 50-2 at 9-13.] Mr. Ramsey's departure was unrelated to any transaction between Pearson and another entity. [Filing No. 50-5 at 2.]

In June 2015, Thomas Lukasik, who worked as a Key Account Manager at Pearson, left his job and received severance benefits. [Filing No. 50-2 at 21-22; Filing No. 50-5 at 2; Filing No. 51 at 25.] Prior to his departure, Mr. Lukasik's supervisor was Director of Operations Anthony Clark. [Filing No. 50-2 at 21.] In March 2015, Mr. Lukasik asked Mr. Nathanson if Pearson was going to do another round of budget reduction and Mr. Nathanson advised him to speak to Ms.

Freeman.  [Filing No. 50-2 at 21.]  At some time between the end of March and the middle of April

2015, Mr. Lukasik asked Ms. Freeman about the severance pay process.  [Filing No. 50-2 at 22.]

In June, Mr. Lukasik left his job at Pearson and was paid two weeks of salary for every year of

service at Pearson, and medical coverage through September 2015.  [Filing No. 50-2 at 22.]  Mr.

Mr. Lukasik's exit from Pearson was unrelated to any transaction with another entity.  [Filing No.

50-5 at 2.]

### C.  Pearson's Transaction with R.R Donnelley

In late-July 2014, Pearson sent out a Request for Proposal ("RFP") seeking proposals from

companies to operate Pearson's end-to-end print supply chain in North America.  [Filing No. 50-

3 at 3.]  R.R. Donnelley was among the companies to respond to the RFP.  [Filing No. 50-3 at 3.]

In summer 2015, Pearson decided to transfer its warehouses, print, manufacturing, paper

procurement, and supporting services to R.R. Donnelley, and provided R.R. Donnelley with a list

of individuals employed at Pearson's warehouses.  [Filing No. 50-3 at 3.]  In July 2015, Mr. Scheu-

ring, who supervised Ms. Barbera and others, provided R.R. Donnelley with ratings detailing his

team's skills in order to assist R.R. Donnelley with making placement decisions within its organ-

ization.  [Filing No. 50-3 at 3.]  Regarding Ms. Barbera, Mr. Scheuring wrote:

> Vicki is the top  Log Pro Analyst with the most broad
> understanding of the various businesses at Pearson.  She
> is very strong in APC and TMS with a good knowledge of
> WMS.  She also is has most knowledge of Connections and
> Assessments

[Filing No. 50-3 at 10.]

In August 2015, Mr. Scheuring exchanged several emails with Jeff Eisentraut, who was

the Vice President of Information Technology at R.R. Donnelley.  [Filing No. 50-3 at 11-14.]  On

August 20, 2015, Mr. Eisentraut asked Mr. Scheuring if he would consider Ms. Barbera and two

other Pearson employees "super users."  [Filing No. 50-3 at 14.]  The next day, Mr. Eisentraut

again wrote to Mr. Scheuring concerning Ms. Barbera and the same two Pearson employees, this time stating:

> Based on the helpful information you provided I am viewing the above folks as super users - and that they really do no have any RPG or programming skills to go in and modify source code.  Hence it would probably make most sense that they would report up to the business and John Ramich vs. being part of Andrew Wallace and team reporting up to me in IT -  would you concur?

[Filing No. 50-3 at 12.]  Mr. Scheuring responded as follows:

> Your assumption on Richard is correct.  However I would categorize Laura and Vicki as more than super users. Instead  I would call them system analysts.  True they do not write RPG programs but they have technical capability.  For example they both have mapped interfaces, participated in detailed program designs and have deep understanding of how Log Pro functions.  Also both have headed up full warehouse implementations.

[Filing No. 50-3 at 11.]  Mr. Scheuring ended his email with, "I hope that helps," to which Mr. Eisentraut replied, "Yes that does – I could use folks like Laura [Dwyer] and Vicki [Barbera] as there will be plenty of mapping/interface work coming down the pipe in the next 2 years." [Filing No. 50-3 at 11.]

On or around September 15, 2015, Mr. Scheuring, Ms. Barbera's supervisor, informed her that he would be asking her for data for quite some time because a transition was going to occur. [Filing No. 50-3 at 4; Filing No. 51 at 14; Filing No. 51 at 40.]  Along with Ms. Barbera, Mike Nicholson and Laura Dwyer were also asked to gather data related to the transition.  [Filing No. 51 at 14.]  Thereafter, Mr. Scheuring would ask Ms. Barbera questions pertaining to specific data. [Filing No. 51 at 14.]

Around the same time, Mr. Scheuring began referring R.R. Donnelley to Mr. Wallace for technical questions that involved the intricacies of programming, applications, and hardware because of Mr. Wallace's expertise in that area.  [Filing No. 50-3 at 5.]  Meanwhile, Mr. Wallace came to Ms. Barbera to ask her questions regarding how certain things worked.  [Filing No. 51 at 14-15.]  Mr. Wallace would communicate information that he obtained to R.R. Donnelley at their

request.  [Filing No. 51 at 16.]  Ms. Barbera never asked anyone on Pearson's management team why Mr. Wallace was performing this function instead of her.  [Filing No. 51 at 16.]  Mr. Wallace attended meetings related to this function on a weekly or biweekly basis.  [Filing No. 51 at 14.]  Those meetings were attended by Jeff Eisentraut, Mike Nicholson, and others.  [Filing No. 51 at 15.]

On October 13, 2015, Pearson signed a contract governing the transfer of warehouses, print, manufacturing, paper procurement, and supporting services to R.R. Donnelley.  [Filing No. 50-3 at 3.]

In mid-January 2016, Pearson held a meeting to inform individuals who worked at Pearson's Indy North facility – including Ms. Barbera – that the facility and distribution operations would be transferred to R.R. Donnelley.  [Filing No. 51 at 10.]  At the meeting it was revealed that the majority of the employees would have the opportunity to "rebadge" by being offered a position with R.R. Donnelley and that their salaries and employment would be guaranteed for six months.  [Filing No. 51 at 10.]  This transaction affected approximately 700 employees, both male and female, who were informed that their employment with Pearson would be terminated on February 29, 2016.  [Filing No. 50-3 at 3.]

Along with information conveyed at the January 2016 meeting, Pearson employees were given a Frequently Asked Questions ("FAQ") memorandum.  [Filing No. 50-3 at 3-4.]  One question and answer in the FAQ memorandum dealt with severance:

> *If I choose to leave Pearson before the transition to RRD, will I receive a severance package?*
> Employees are not eligible for severance who opt to resign rather than transition to RR Donnelley.

[Filing No. 50-3 at 7.]

Ms. Barbera sent an email to Michael Nathanson, Pearson's Senior Vice President of Distribution, in January of 2016, around the time of the formal announcement of Pearson's transaction with R.R. Donnelley.   [Filing No. 49-1 at 2.][3]  Ms. Barbera also copied this email to Michael Scheuring, Pearson's Director of Supply Chain.  [Filing No. 49-1 at 2.]  Ms. Barbera's email message asked Mr. Nathanson whether she could receive severance pay rather than rebadging over to R.R. Donnelley, and stated that she would be happy to extend her employment long enough to help in the transition, but that she did want to leave.  [Filing No. 49-1 at 2.]  Mr. Nathanson responded within one workday by denying Ms. Barbera's request for severance pay, and stating that if she had wanted to exit with severance, she would have had to have asked for it within the deadline for the 2014 VSP.  [Filing No. 49-1 at 2.]  Ms. Barbera interpreted Mr. Nathanson's email as a reference to the Pearson Voluntary Severance Pay policy dated February 1, 2014.  [Filing No. 49-1 at 2.]  Mr. Nathanson's reply email to Ms. Barbera did not say anything about the R.R. Donnelley outsourcing or transaction being the reason why he was denying her request for severance. [Filing No. 49-1 at 3.]  Mr. Nathanson's reply email to Ms. Barbera did not say anything about "rebadging" being the reason why he was denying her request for severance.  [Filing No. 49-1 at 3.]

On February 18, 2016, Daniel Lennon wrote a letter to Ms. Barbera's counsel in response to correspondence dated February 8, 2016, which provided as follows:

---

[3] The facts set forth in this paragraph are taken as true pursuant to the Court's Order at Filing No. 62.

Pearson acknowledges and is grateful for the many years of service Ms. Barbera provided the Company. It recognizes her accomplishments and appreciates all of them. However, per the clear language of the Company's severance policy, Ms. Barbera is not entitled to severance.

Attached hereto as Exhibit 1 is a copy of Pearson's Severance Policy. The fifth paragraph under the "Policy" section states that, "Severance pay will not be paid to employees whose termination is the result of a merger or acquisition", as set forth in detail in the section titled "Severance as a Result of a Merger/Acquisition" of this policy. Under the "Severance as a Result of Merger/Acquisition" section of the policy, it clearly states that no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger....or any other transaction when such employee is offered employment by the purchaser or another employer in connection with the transaction…". That is exactly what occurred in Ms. Barbera's case. She is to be offered employment by R.R. Donnelly effective February 29, 2016 and therefore is not entitled to severance.

[Filing No. 49-6 at 2.]

R.R. Donnelley offered Ms. Barbera the same position she had held at Pearson – Manager of Business Analysis – at the North Indy facility, which would have taken effect March 1, 2016. [Filing No. 51 at 12.] Ms. Barbera refused this employment offer and communicated this refusal to R.R. Donnelley by not showing up for work on March 1, 2016. [Filing No. 51 at 12.] She later verified that she had refused R.R. Donnelley's employment offer over the telephone to Andrew Wallace after he called to inquire. [Filing No. 51 at 12.]

After Ms. Barbera's employment at Pearson ended, she made no attempts to seek new employment. [Filing No. 51 at 6.] Ms. Barbera has not earned any income since February 29, 2016. [Filing No. 51 at 32.]

**D. The Lawsuit**

Ms. Barbera initiated this lawsuit on September 23, 2016, and filed the operative Amended Complaint on February 15, 2017. [Filing No. 1; Filing No. 24.] Pearson has moved for summary judgment, [Filing No. 50], and that motion is now ripe for the Court's decision.

- 15 -

**IV.**

**DISCUSSION**

### A.  Sex Discrimination Claim

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) (citing 42 U.S.C. § 2000e-2(a)(1)).  "To survive summary judgment on a Title VII discrimination claim, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Milligan-Grimstad v. Stanley*, __ F.3d __, 2017 WL 6276198, at *2 (7th Cir. Dec. 11, 2017) (quotation omitted).

This Court's analysis of Ms. Barbera's Title VII claim comes nearly a year and a half after the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).  Since that time, the Court of Appeals has had numerous opportunities to explain and apply *Ortiz* in a variety of employment contexts, and it is to this body of law that the Court now turns.  *Ortiz* "discarded the long-standing practice of distinguishing between 'direct' and 'indirect' evidence in analyzing discrimination claims." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017) (citation omitted).  Now, instead of separating evidence under different methods of proof, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cty., Illinois,* 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz,* 834 F.3d at 765).  In determining whether the evidence would permit a reasonable factfinder to conclude that Ms. Barbera's sex caused her to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and

assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Both Pearson and Ms. Barbera organize their arguments in terms of the *McDonnell Douglas* framework and the Court will follow suit.  This familiar framework requires Ms. Barbera to show that: (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment.  *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017).  If Ms. Barbera makes this prima facie showing, the burden shifts to Pearson to come forward with a legitimate, nondiscriminatory reason for the challenged employment action.  *Id.*  If Pearson does this, then the burden shifts back to Ms. Barbera to produce evidence establishing a genuine dispute of fact about whether Pearson's reason was a pretext for discrimination.  *Id.*

Ms. Barbera argues that Pearson discriminated against her in two ways:  (1) by denying her severance; and (2) by denying her a role as an information technology liaison during the transition to R.R. Donnelley.

### 1.  *The Denial of Severance*

Turning to the first issue, Pearson alleges that "*all* employees affected by Pearson's transaction with R.R. Donnelley – male and female" – were treated the same.  [Filing No. 52 at 13 (emphasis in original).]  Pearson additionally argues that Ms. Barbera cannot show that she was treated differently than the three male colleagues she identified because those individuals were not similarly situated.  [Filing No. 52 at 13-14.]

In response, Ms. Barbera argues that she met her initial burden regarding her sex discrimination claim by showing that: "(1) she is female; (2) she was receiving 'outstanding' performance evaluations; (3) she suffered an adverse employment action in that she was denied severance pay when she requested it, and (4) three male colleagues were treated more favorably . . . in that they were granted severance pay when they were ineligible under the explicit terms of the plan." [Filing No. 60 at 12.]

In its reply brief, Pearson reiterates that Ms. Barbera's alleged comparators received severance under "completely different circumstances" than existed at the time of her requests for severance because her requests implicated Pearson's severance policy provision while the alleged comparators' requests did not.  [Filing No. 61 at 3-4.]

In identifying one or more similarly situated individuals outside her protected class who received better treatment, Ms. Barbera must submit evidence that she and the similarly situated male employees "reported to the same supervisor, engaged in the same conduct, and had the same qualifications," and that "there were no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'"  *Johnson v. Chicago Transit Auth.*, 699 F. App'x 558, 559 (7th Cir. 2017) (citations omitted).

Ms. Barbera identifies three men who received severance outside the periods of time contemplated in the 2013 VSP and the 2014 VSP:  Paul Zale, Tony Ramsey, and Thomas Lukasik. The record indicates that each of these individuals reported to different supervisors,[4] and is largely

---

[4] While Ms. Barbera reported to Michael Scheuring, [Filing No. 50-2 at 6,] Mr. Zale reported to Steve Wenz, [Filing No. 50-2 at 2], Mr. Ramsey reported to Mike Nicholson, [Filing No. 50-2 at 6], and Mr. Lukasik reported to Anthony Clark, [Filing No. 50-2 at 21].

silent on the individuals' various qualifications.  That said, "the similarly situated analysis is flexible, and the result depends on any relevant factors and common sense."  *Majors v. Gen. Elec. Co.,* 714 F.3d 527, 538 (7th Cir. 2013).  The Court will, therefore, look past unduly technical distinctions among the individuals.

The problem with Ms. Barbera's reliance on these individuals as comparators is that they left Pearson in September 2014, April 2015, and June 2015, respectively – well before Ms. Barbera alleges she made her first severance request "sometime in the later part of 2015."[5] [Filing No. 60 at 4.]  The distinction in the timing of the requests is significant given the evidence that the situation at Pearson evolved significantly over the course of 2015.  The record indicates, for example, that in July 2015, Mr. Scheuring began providing R.R. Donnelley with ratings detailing his team's skills in order to assist R.R. Donnelley with making placement decisions within its organization.  [Filing No. 50-3 at 3; Filing No. 50-3 at 10.]  By September, Mr. Scheuring informed Ms. Barbera that he would be asking her for data because a transition was going to occur.  [Filing No. 51 at 14; Filing No. 51 at 40.]  And on October 13, 2015, Pearson signed a contract governing the transfer of warehouses, print, manufacturing, paper procurement, and supporting services to R.R. Donnelley.  [Filing No. 50-3 at 3.]  There existed, therefore, a major differentiating or mitigating circumstance that distinguishes Pearson's treatment of individuals who requested severance in late 2014 and early 2015 from Ms. Barbera who requested severance, at the earliest, in the latter half of 2015.  In short, Pearson's impending transaction with R.R. Donnelley with the promise of continued to

---

[5] The Court notes that Ms. Barbera contends in her response brief that "there is no evidence in the record to indicate" whether Ms. Barbera made three alleged requests for severance "before or after September, 2015."  [Filing No. 60 at 14 n.3.]  The only evidence of these requests consists of Ms. Barbera's deposition testimony on the subject.  However, the burden of identifying similarly situated individuals falls on Ms. Barbera.  At no point does Ms. Barbera allege, let alone show, that she made requests for severance in the same period of time as Mr. Zale, Mr. Ramsey, or Mr. Lukasik.

employment to individuals such as Ms. Barbera, constitutes a differentiating circumstance, such that the individuals identified by Ms. Barbera are not similarly situated.

This differentiating circumstance is also demonstrated by the Severance Policy, which provides that "no severance will be paid to an employee terminated as a result of a sale of assets, sale of stock, merger, consolidation, liquidation, dissolution, or any other transaction when such employee is offered employment by . . . another employer in connection with the transaction." [Filing No. 50-4 at 11.]   Neither Mr. Zale, nor Mr. Ramsey, nor Mr. Lukasik were offered employment by another employer under the terms of the Severance Policy.  [Filing No. 50-4 at 4; Filing No. 50-5 at 2.] Nor is there any evidence that any of Ms. Barbera's proposed comparators would have been given a job by R.R. Donnelley after its transaction with Pearson.  Ms. Barbera, however, was offered the same position she had held at Pearson – Manager of Business Analysis – at the North Indy facility with R.R. Donnelley, which would have taken effect March 1, 2016.  [Filing No. 51 at 12.]  She was one of approximately 700 employees, both male and female, who were informed that their employment with Pearson would be terminated on February 29, 2016.  [Filing No. 50-3 at 3.]  Had Pearson offered Ms. Barbera severance in January or February 2016, it would have been treating her differently than the 700 other individuals who were offered new jobs with R.R. Donnelley, none of whom were eligible for severance under the terms of the Severance Policy.

Likewise, there is no evidence that there were any similarly situated male employees – meaning employees who left Pearson's employ after July 2015 – who were offered positions with R. R. Donnelly and were also offered severance.  Indeed, Ms. Barbera's own deposition testimony establishes that no male employee of the Indy North distribution center whose employment terminated on the same day as Ms. Barbera's was offered severance pay from Pearson, [Filing No. 51 at 28], and that the sale to R.R. Donnelley affected Ms. Barbera and other managers of business

analysis – male and female – in the same way, [Filing No. 51 at 10].  Ms. Barbera was not similarly situated to her proposed comparators; she was similarly situated to hundreds of employees who were offered new jobs with R.R. Donnelley, and the evidence shows that she was similarly treated to them.

Having failed to meet her burden under *McDonnell Douglas*, the Court need not proceed to analyze Ms. Barbera's allegations regarding severance under the burden shifting method.  Instead, returning to the guidance set forth in *Ortiz*, Ms. Barbera's failure to meet her burden under *McDonnell-Douglas* demonstrates that there is insufficient evidence, when taken as a whole, to permit a reasonable factfinder to conclude that Ms. Barbera was denied severance because of her sex.

Although Ms. Barbera has not set forth a prima facie case of sex discrimination, the Court will briefly consider the issue of pretext.  To show pretext, Ms. Barbera must establish that a "phony reason (not just an unfounded one)" was given for her denial of severance.  *Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (citing *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013); *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)).  Such an inquiry requires this Court to "evaluate the honesty of the employer's explanation, rather than its validity or reasonableness."  *Hill*, 724 F.3d at 968 (citations omitted).  Ms. Barbera alleges that she made two requests for severance in early 2016, each of which she contends were denied under a false pretext.  [Filing No. 60 at 15-18.]  As to Ms. Barbera's request in January 2016, Mr. Nathanson responded by stating "that if she had wanted to exit with severance, she would have had to have asked for it within the deadline for the 2014 Voluntary Severance Program ("VSP")."  [Filing No. 49-1 at 2.]  As to her request in February 2016, Mr. Lennon responded by stating that Ms. Barbera was not entitled to severance "per the clear language" of the Severance Policy because

she was being offered employment by R.R. Donnelley.  [Filing No. 49-6 at 2.]  Nothing in the

record suggests that either of those reasons were proffered by Pearson in order to mask unlawful

discrimination or that Pearson lied about its reasons for not offering Ms. Barbera severance.  Ms.

Barbera may believe that Pearson's reasons for denying her severance in January and February

2016 were unfounded, but she has not met her burden of proving by a preponderance of the evi-

dence that the reasons were pretext for discrimination.

### 2.   *The Denial of an Information Technology Role*

Turning next to Ms. Barbera's contention that she was denied a specific role during the

transition to R.R. Donnelley, Pearson alleges that it cannot be held responsible for denying her an

"Information Technology contact position" because it did not create any such position - R.R. Don-

nelley did.  [Filing No. 52 at 13.]

Ms. Barbera contends that Pearson is responsible for denying her an information technol-

ogy liaison role at R.R. Donnelley under the "cat's paw" theory, wherein an employer is liable for

tainting or influencing an independent decision maker with the employer's illegal motives.  [Filing

No. 60 at 18.]  Specifically, she alleges "[a]lthough Mr. Scheuring was not technically the final

decisionmaker" about what position to offer her at R.R. Donnelley, "it is clear that R.R. Donnelley

was relying heavily on Mr. Scheuring's recommendations in making its decision," and that she

"has raised a sufficient issue of fact for a jury to decide whether Pearson should have placed her

in the IT liaison role."  [Filing No. 60 at 19.]

Pearson responds that failing to place Ms. Barbera in a position that did not exist is not an

adverse employment action under Title VII.  [Filing No. 61 at 12.]  Moreover, Pearson contends

that Ms. Barbera's cat's paw theory "simply does not make sense."  [Filing No. 61 at 13.]  Finally,

Pearson argues that there is simply no evidence that Mr. Scheuring has any discriminatory animus toward Ms. Barbera.  [Filing No. 61 at 13.]

The "cat's paw" theory that Ms. Barbera presents provides that courts may find direct evidence of discrimination where "a biased subordinate" who lacks decision making power to fire an employee "uses a formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citations and quotations omitted).  Applying the cat's paw theory to the case at hand is inapposite at each turn.  First, Ms. Barbera's "biased subordinate" is, in fact, not a subordinate at all, let alone one who lacked decision making power.  To the contrary, Mr. Scheuring was Ms. Barbera's direct supervisor.  [Filing No. 50-2 at 6.]  Second, the employer that Ms. Barbera seeks to hold liable – Pearson – is not the entity that Ms. Barbera claims was used to trigger a discriminatory employment action by a biased subordinate.  In her response brief, she specifically alleges that "it is clear that R.R. Donnelley was relying heavily on Mr. Scheuring's recommendations in making its decision."  [Filing No. 60 at 19.]  But R.R. Donnelley can incur liability for sex discrimination only if Ms. Barbera can "prove the existence of an employer-employee relationship" with R.R. Donnelley.  *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017) (quoting *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015)).  In this case, Ms. Barbera was never an employee of R.R. Donnelley, having refused its employment offer by not showing up for work on March 1, 2016.  [Filing No. 51 at 12.]  Even if the facts of this case could be shoehorned into the cat's paw theory, there is no evidence in the record that Mr. Scheuring harbored a discriminatory animus toward Ms. Barbera.  Quite the opposite is true.  The record contains evidence that Mr. Scheuring informed R.R. Donnelley that Ms. Barbera was "very strong" with "a good knowledge" of systems and the "most knowledge" of connections and assessments,

[Filing No. 50-3 at 10], that she was "more than a superuser" and had a "deep knowledge" of certain company functions, [Filing No. 50-3 at 11].  For these reasons, the Court finds that there is insufficient evidence to draw any conclusion of discrimination under the cat's paw theory.

Ms. Barbera has not set forth a prima facie case of sex discrimination related to the denial of severance or the denial of any role with R.R. Donnelley.  Accordingly, her sex discrimination claim fails as a matter of law, and Pearson is entitled to summary judgment on that claim.[6]

### B.  Equal Pay Act Claim

Nearly five months after filing her complaint, Ms. Barbera filed an Amended Complaint adding a cause of action pursuant to the Equal Pay Act.  [Filing No. 24.]  In its Motion for Summary Judgment, Pearson argues that Ms. Barbera's Equal Pay Act claim fails because "Pearson had a gender-neutral justification for providing severance benefits to the three male colleagues Ms. Barbera identified: the ending of their employment occurred under wholly different circumstances not

---

[6] Although Ms. Barbera's Title VII claim fails as a matter of law on its merits, the Court will briefly address Ms. Barbera's efforts to mitigate her damages consistent with the Circuit's "longstanding" and "repeatedly reaffirmed" framework for evaluating mitigation questions. *Stragapede v. City of Evanston, Illinois*, 865 F.3d 861, 868 (7th Cir. 2017).  To prove a failure to mitigate in this context, the Pearson must show that (1) Ms. Barbera failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that she might have found comparable work by exercising reasonable diligence.  *Id*. at 868 (quoting *Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir. 1990)).

Here, notwithstanding her unsuccessful efforts to earn an income by day trading, the evidence establishes that Ms. Barbera turned down a guaranteed six months at her Pearson salary, [Filing No. 51 at 12], made no attempts to seek new employment, [Filing No. 51 at 6], and has not earned any income since February 29, 2016, [Filing No. 51 at 32].  Given these facts, and considering Ms. Barbera's considerable educational background and work experience, it is all but established that she failed to mitigate her damages.  *See, e.g., Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771-72 (7th Cir. 2006) (finding a failure to mitigate where a plaintiff with "vast experience plus an educational background that includes a master's degree in biomedical engineering" contacted 23 firms without success).  However, having decided the case on the grounds that Ms. Barbera has not set forth a prima facie case of sex discrimination, the Court need not make a specific finding on this issue.

applicable to Ms. Barbera when she finally expressed her desire to leave Pearson voluntarily." [Filing No. 52 at 25.]  In response, Ms. Barbera makes no specific arguments regarding her Equal Pay Act claim.  [Filing No. 60.]  In its reply brief, Pearson notes that Ms. Barbera does not distinguish between her Title VII and Equal Pay Act claims, and it accordingly addresses such claims together in its reply.  [Filing No. 61 at 2.]

The Equal Pay Act prohibits an employer from discriminating between employees on the basis of sex.  29 U.S.C. § 206(d)(1).  "To establish a prima facie cause of action under the Act, an employee must demonstrate a difference in pay for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Lauderdale v. Illinois Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (citation and quotation omitted).  The Act provides four affirmative defenses by which the employer can claim the discrepancy is not discriminatory: "where . . . payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* at 907 (quoting 29 U.S.C. § 206(d)(1)).  "An employer asserting that the difference is the result of a 'factor other than sex' must present this contention as an affirmative defense—and the proponent of an affirmative defense has the burdens of both production and persuasion." *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012).

Ms. Barbera fails to mention the Equal Pay Act in her response to Pearson's Motion for Summary Judgment and otherwise fails to set forth a prima facie cause of action under the Act. However, even if the Court were to infer that Mr. Zale, Mr. Ramsey, and Mr. Lukasik are the relevant comparators for the purposes of Ms. Barbera's Equal Pay Act claim, this claim fails for the same reason that her Title VII claim fails.  Even assuming *arguendo* that Ms. Barbera was able

to demonstrate a prima facie cause of action under the Equal Pay Act, the three individuals she identifies as having been similarly situated left Pearson before the company began its transition with R.R. Donnelley. [Filing No. 50-3 at 3; Filing No. 50-3 at 10.] Just as this distinction in timing constitutes a "mitigating circumstance" under Title VII, it also proves to be a "differential based on a factor other than sex" under the Equal Pay Act. As such, Ms. Barbera's Equal Pay Act claim fails as a matter of law, and Pearson is entitled to summary judgment on that claim.

## V.
### CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, [66], and **GRANTS** Pearson's Motion for Summary Judgment, [50]. Final judgment shall enter accordingly.

Date: 12/28/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VICKI BARBERA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | No. 1:16-cv-2533-JMS-DML |
| | ) | |
| PEARSON EDUCATION, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |

## FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 58

For the reasons set forth in the Court's Order entered on December 28, 2017, the Court now

enters **FINAL JUDGMENT** against Plaintiff and in favor of Defendant, such that Plaintiff shall

take nothing by way of her Complaint.

Date: 12/28/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Laura A. Briggs, Clerk

BY: _____

Deputy Clerk, U.S. District Court

**Distribution via ECF only to all counsel of record**

# *** PUBLIC DOCKET ***

APPEAL,CMP,CLOSED

**U.S. District Court**
**Southern District of Indiana (Indianapolis)**
**CIVIL DOCKET FOR CASE #: 1:16-cv-02533-JMS-DML**

BARBERA v. PEARSON EDUCATION, INC.
Assigned to: Judge Jane Magnus-Stinson
Referred to: Magistrate Judge Debra McVicker Lynch
Cause: 42:2000e Job Discrimination (Employment)

Date Filed: 09/23/2016
Date Terminated: 12/28/2017
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**VICKI BARBERA**

represented by **Annavieve C. Conklin**
DELANEY & DELANEY LLC
3646 Washington Blvd.
Indianapolis, IN 46205
317-920-0400
Fax: 317-920-0404
Email:
ACONKLIN@DELANEYLAW.NET
*ATTORNEY TO BE NOTICED*

**Kathleen Ann DeLaney**
DELANEY & DELANEY LLC
3646 North Washington Blvd.
Indianapolis, IN 46205
(317) 920-0400
Fax: (317) 920-0404
Email: kathleen@delaneylaw.net
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**PEARSON EDUCATION, INC.**

represented by **Cynthia K. Springer**
FAEGRE BAKER & DANIELS LLP
300 North Meridian Street
Suite 2700
Indianapolis, IN 46204
(317)237-1328
Fax: (317)237-1000
Email: cynthia.springer@faegrebd.com

*ATTORNEY TO BE NOTICED*

**Sarah V. Bowers**
FAEGRE BAKER DANIELS LLP
(Indianapolis)
300 North Meridian Street
Suite 2700
Indianapolis, IN 46204
317-237-0300
Email: sarah.bowers@faegrebd.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/23/2016 | 1 | COMPLAINT *and Demand for Jury Trial* against PEARSON EDUCATION, INC., filed by VICKI BARBERA. (Filing fee $400, receipt number 0756-4060089) (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (DeLaney, Kathleen) (Entered: 09/23/2016) |
| 09/23/2016 | 2 | NOTICE of Appearance by Kathleen Ann DeLaney on behalf of Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 09/23/2016) |
| 09/26/2016 | 3 | Summons Issued as to PEARSON EDUCATION, INC. (AAM) (Entered: 09/26/2016) |
| 09/26/2016 | 4 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (AAM) (Entered: 09/26/2016) |
| 09/27/2016 | 5 | PROCEDURES AND PRACTICES before Judge Jane Magnus-Stinson. (GSO) (Entered: 09/27/2016) |
| 10/03/2016 | 6 | RETURN of Service by CMRRR, filed by VICKI BARBERA. PEARSON EDUCATION, INC. served on 9/28/2016. (DeLaney, Kathleen) (Entered: 10/03/2016) |
| 10/19/2016 | 7 | NOTICE of Appearance by Sarah V. Bowers on behalf of Defendant PEARSON EDUCATION, INC.. (Bowers, Sarah) (Entered: 10/19/2016) |
| 10/19/2016 | 8 | NOTICE of Appearance by Cynthia K. Springer on behalf of Defendant PEARSON EDUCATION, INC.. (Springer, Cynthia) (Entered: 10/19/2016) |
| 10/19/2016 | 9 | Corporate Disclosure Statement by PEARSON EDUCATION, INC. identifying Corporate Parent PEARSON PLC, Corporate Parent Pearson, Inc. for PEARSON EDUCATION, INC... (Springer, Cynthia) (Entered: 10/19/2016) |
| 10/19/2016 | 10 | *Defendant Pearson Education, Inc.'s* ANSWER to 1 Complaint *and Demand for Jury Trial*, filed by PEARSON EDUCATION, INC..(Springer, Cynthia) (Entered: 10/19/2016) |
| 10/21/2016 | 11 | NOTICE of Appearance by Audreyalice Kubesch Warner on behalf of Plaintiff VICKI BARBERA. (Warner, Audreyalice) (Entered: 10/21/2016) |

| 10/24/2016 | 12 | SCHEDULING ORDER: Initial Pretrial Conference set for 11/17/2016 11:30 AM in room #277, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Debra McVicker Lynch. Read this order carefully; it sets out the court's expectations for the conference. Signed by Magistrate Judge Debra McVicker Lynch on 10/24/2016.(SWM) (Entered: 10/25/2016) |
| 11/10/2016 | 13 | *Joint* CASE MANAGEMENT PLAN TENDERED, filed by Plaintiff VICKI BARBERA *and Pearson Education, Inc..* (Warner, Audreyalice) (Entered: 11/10/2016) |
| 11/11/2016 | 14 | Joint MOTION for Protective Order , filed by Defendant PEARSON EDUCATION, INC.. (Attachments: # 1 Text of Proposed Order Uniform Stipulated Protective Order)(Bowers, Sarah) (Entered: 11/11/2016) |
| 11/14/2016 | 15 | UNIFORM STIPULATED PROTECTIVE ORDER 14 APPROVED. Signed by Magistrate Judge Debra McVicker Lynch on 11/14/2016.(SWM) (Entered: 11/14/2016) |
| 11/18/2016 | 16 | MINUTE ORDER for proceedings held before Magistrate Judge Debra McVicker Lynch: Initial Pretrial Conference held on 11/17/2016. The case management plan submitted in this case is approved as modified to include (1) Sec. III E. The parties shall submit (not file) courtesy copies of their respective demand and response at the time of service via email to judgelynchchambers@insd.uscourts.gov. There is no need to follow the email with a hard copy; and (2) the modifications set forth on the approval page (last page) of the document. Signed by Magistrate Judge Debra McVicker Lynch. (NLR) (Entered: 11/18/2016) |
| 11/28/2016 | 17 | ORDER: CASE MANAGEMENT PLAN APPROVED AS AMENDED. Dispositive Motions due by 8/7/2017. Discovery due by 6/23/2017. Signed by Magistrate Judge Debra McVicker Lynch on 11/28/2016.(SWM) (Entered: 11/28/2016) |
| 12/01/2016 | 18 | MOTION to Withdraw Attorney Appearance , filed by Plaintiff VICKI BARBERA. (Attachments: # 1 Text of Proposed Order)(Warner, Audreyalice) (Entered: 12/01/2016) |
| 12/05/2016 | 19 | ORDER granting 18 Motion to Withdraw Attorney Appearance. Attorney Audreyalice Kubesch Warner withdrawn. Signed by Magistrate Judge Debra McVicker Lynch on 12/5/2016. (SWM) (Entered: 12/05/2016) |
| 01/05/2017 | 20 | NOTICE of Appearance by Annavieve C. Conklin on behalf of Plaintiff VICKI BARBERA. (Conklin, Annavieve) (Entered: 01/05/2017) |
| 01/23/2017 | 21 | NOTICE of Service of Initial Disclosures , filed by Plaintiff VICKI BARBERA. (Conklin, Annavieve) (Entered: 01/23/2017) |
| 02/14/2017 | 22 | Unopposed MOTION for Leave to File *First Amended Complaint and Demand for Jury Trial*, filed by Plaintiff VICKI BARBERA. (Attachments: # 1 Exhibit 1 - First Amended Complaint and Demand for Jury Trial, # 2 Text of Proposed Order)(DeLaney, Kathleen) (Entered: 02/14/2017) |

| 02/15/2017 | 23 | ORDER granting Plaintiff's 22 Motion for Leave to File Amended Complaint. Signed by Magistrate Judge Debra McVicker Lynch on 2/15/2017. (SWM) (Entered: 02/16/2017) |
| 02/15/2017 | 24 | AMENDED COMPLAINT and Demand for Jury Trial against PEARSON EDUCATION, INC., filed by VICKI BARBERA.(SWM) (Entered: 02/16/2017) |
| 02/23/2017 | 25 | Exhibit List *Plaintiff's Preliminary*, filed by Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 02/23/2017) |
| 02/23/2017 | 26 | Witness List *Plaintiff's Preliminary*, filed by Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 02/23/2017) |
| 02/28/2017 | 27 | *Defendant Pearson Education, Inc.'s* ANSWER to 24 Amended Complaint *and Demand for Jury Trial*, filed by PEARSON EDUCATION, INC..(Springer, Cynthia) (Entered: 02/28/2017) |
| 03/02/2017 | 28 | ORDER Setting Settlement Conference and Related Deadlines: Settlement Conference set for 5/12/2017 09:30 AM (Eastern Time) in room #277, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Debra McVicker Lynch. On or before three (3) business days before the conference, the parties shall submit (not file) a confidential settlement statement. See Order for additional information. Signed by Magistrate Judge Debra McVicker Lynch on 3/2/2017.(SWM) (Entered: 03/02/2017) |
| 03/10/2017 | 29 | TRIAL SETTING AND NOTICE OF FINAL PRETRIAL CONFERENCE - This cause is hereby set for a Jury Trial before Judge Jane Magnus-Stinson on March 26, 2018 at 9:00 a.m. in Room 307 of the Birch Bayh Federal Building and U.S. Courthouse, 46 East Ohio Street, Indianapolis, Indiana. A Final Pretrial Conference is also set for March 1, 2018 at 9:00 a.m. in Room 307 of the Birch Bayh Federal Building and U.S. Courthouse, 46 East Ohio Street, Indianapolis, Indiana. Counsel are reminded of the required pretrial preparation deadlines set forth in paragraph VIII of the case management plan [dkt. 17]. Counsel are further reminded to review the undersigned's Practices and Procedures, available at docket item 5. Signed by Judge Jane Magnus-Stinson on 3/10/2017.(MRI) (Entered: 03/10/2017) |
| 03/23/2017 | 30 | Exhibit List *Preliminary*, filed by Defendant PEARSON EDUCATION, INC., Witness List *Preliminary*, filed by Defendant PEARSON EDUCATION, INC.. (Springer, Cynthia) (Entered: 03/23/2017) |
| 05/16/2017 | 31 | ENTRY from Settlement Conference held before Magistrate Judge Debra McVicker Lynch on 5/12/2017. The conference was held and concluded without settlement. Signed by Magistrate Judge Debra McVicker Lynch. (KGK) (Entered: 05/16/2017) |
| 06/08/2017 | 32 | MOTION to Quash *and Objections to Subpoena to R.R. Donnelley*, filed by Defendant PEARSON EDUCATION, INC.. (Springer, Cynthia) (Entered: 06/08/2017) |
| 06/08/2017 | 33 | BRIEF/MEMORANDUM in Support re 32 MOTION to Quash *and Objections* |

| | | |
|---|---|---|
| | | *to Subpoena to R.R. Donnelley* , filed by Defendant PEARSON EDUCATION, INC.. (Attachments: # 1 Exhibit Request for Production, # 2 Exhibit Deposition Excerpts)(Springer, Cynthia) (Entered: 06/08/2017) |
| 06/15/2017 | 34 | MOTION for Extension of Time to File Response to 07/24/2017 re 32 MOTION to Quash *and Objections to Subpoena to R.R. Donnelley* , filed by Plaintiff VICKI BARBERA. (Attachments: # 1 Text of Proposed Order) (DeLaney, Kathleen) (Entered: 06/15/2017) |
| 06/23/2017 | 35 | RESPONSE in Opposition re 32 MOTION to Quash *and Objections to Subpoena to R.R. Donnelley* , filed by Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 06/23/2017) |
| 06/26/2017 | 36 | ORDER denying as moot Plaintiff's 34 Motion for Extension of Time to File Response re 32 MOTION to Quash *and Objections to Subpoena to R.R. Donnelley*. Her response to the motion to quash has been filed and is deemed timely. Signed by Magistrate Judge Debra McVicker Lynch on 6/26/2017. (SWM) (Entered: 06/27/2017) |
| 06/30/2017 | 37 | REPLY in Support of Motion re 32 MOTION to Quash *and Objections to Subpoena to R.R. Donnelley* , filed by Defendant PEARSON EDUCATION, INC.. (Attachments: # 1 Exhibit A - Subpoena and Request for Production, # 2 Exhibit B - Deposition Excerpts)(Springer, Cynthia) (Entered: 06/30/2017) |
| 07/06/2017 | 38 | ORDER re 32 MOTION to Quash *and Objections to Subpoena to R.R. Donnelley*. Pearson must file a separate motion if it seeks relief with respect to the LSC subpoena (See Order). Signed by Magistrate Judge Debra McVicker Lynch on 7/6/2017.(CBU) (Entered: 07/07/2017) |
| 07/07/2017 | 39 | Statement *of Claims She Intends to Prove at Trial* by VICKI BARBERA. (DeLaney, Kathleen) (Entered: 07/07/2017) |
| 07/11/2017 | 40 | MOTION to Quash *Subpoena (and Objections)*, filed by Defendant PEARSON EDUCATION, INC.. (Springer, Cynthia) (Entered: 07/11/2017) |
| 07/14/2017 | 41 | RESPONSE in Opposition re 40 MOTION to Quash *Subpoena (and Objections)* , filed by Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 07/14/2017) |
| 07/26/2017 | 42 | Unopposed MOTION for Extension of Time to September 5, 2017 in which to 17 Order: Case ManagementScheduling Order *Dispositive Motion Deadline*, filed by Defendant PEARSON EDUCATION, INC.. (Attachments: # 1 Text of Proposed Order)(Bowers, Sarah) (Entered: 07/26/2017) |
| 07/26/2017 | 43 | Unopposed MOTION for Leave to File *Surreply in Opposition to Defendant's 32 and 40 Motion to Quash Subpoena to R.R. Donnelley*, filed by Plaintiff VICKI BARBERA. (Attachments: # 1 Exhibit 1 - Surreply in Opposition to Defendant's Motion to Quash Subpoena to R.R. Donnelley, # 2 Text of Proposed Order)(DeLaney, Kathleen) Modified on 7/27/2017 (APD). (Entered: 07/26/2017) |
| 07/27/2017 | 44 | ORDER granting 42 Motion for Extension of Time to 9/5/2017 to file a |

| | | dispositive motion. Signed by Magistrate Judge Debra McVicker Lynch on 7/27/2017. (CBU) (Entered: 07/28/2017) |
|---|---|---|
| 07/27/2017 | 45 | ORDER granting 43 Motion for Leave to File surreply. The Clerk is directed to docket the surreply filed at 43-1. Signed by Magistrate Judge Debra McVicker Lynch on 7/27/2017. (CBU) (Entered: 07/28/2017) |
| 07/27/2017 | 46 | Surreply re 32 in opposition to defendant's MOTION to Quash *and Objections to Subpoena to R.R. Donnelley* and 40 MOTION to Quash *Subpoena (and Objections)*, filed by Plaintiff VICKI BARBERA (filed per order this date) (CBU) (Entered: 07/28/2017) |
| 08/11/2017 | 47 | ORDER - on Motions to Quash Subpoenas; The court DENIES AS MOOT the motion Dkt. 32 to quash directed to the R. R. Donnelley subpoena and DENIES the motion Dkt. 40 to quash directed to the LSC Communications subpoena. LSC Communications must produce within 14 days the documents covered by Request 6, as it was limited by Ms. Barbera. Signed by Magistrate Judge Debra McVicker Lynch on 8/11/2017. (CKM) (Entered: 08/11/2017) |
| 08/31/2017 | 48 | MOTION for Sanctions *Against Defendant for Spoliation of Evidence*, filed by Plaintiff VICKI BARBERA. (Attachments: # 1 Text of Proposed Order) (DeLaney, Kathleen) (Entered: 08/31/2017) |
| 08/31/2017 | 49 | BRIEF/MEMORANDUM in Support re 48 MOTION for Sanctions *Against Defendant for Spoliation of Evidence* , filed by Plaintiff VICKI BARBERA. (Attachments: # 1 Exhibit A - Joint Stipulation of Fact, # 2 Exhibit B - Emails Regarding Proposed Stipulation of Fact, # 3 Exhibit C - Defendant's Supplemental Responses to Plaintiff's RFAs, # 4 Exhibit D - Deposition Transcript of Vicki Barbera Excerpts, # 5 Exhibit E - Demand Letter to Dan Lennon, # 6 Exhibit F - Letter from Dan Lennon 2.8.16, # 7 Exhibit G - Defendant's Privilege Log, # 8 Exhibit H - File Marked EEOC Charge, # 9 Exhibit I - Letter to Dan Lennon 2.23.16, # 10 Exhibit J - Notice of Charge, # 11 Exhibit K - Letter from Pearson's Counsel 4.21.17, # 12 Exhibit L - Defendant's Responses to Plaintiff's Second Set of Interrogatories, # 13 Exhibit M - Plaintiff's First Requests for Production, # 14 Exhibit N - Letter from Barbera's Counsel 4.12.17, # 15 Exhibit O - Letter from Barbera's Counsel 4.21.17, # 16 Exhibit P - Letter from Pearson's Counsel 6.9.17, # 17 Exhibit Q - February 18, 2016 Email)(DeLaney, Kathleen) (Entered: 08/31/2017) |
| 09/05/2017 | 50 | MOTION for Summary Judgment , filed by Defendant PEARSON EDUCATION, INC.. (Attachments: *** SEALED PER ORDER DATED 9/11/2017 *** # 1 Exhibit 1 - Plaintiff Vicki Barbera deposition transcript excerpts, # 2 Exhibit 2 - Plaintiff Vicki Barbera deposition exhibits Nos. 12, 13, and 14, # 3 Exhibit 3 - Affidavit and exhibits of Michael Scheuring, # 4 Exhibit 4 - Affidavit and exhibits of Deborah Freeman, # 5 Exhibit 5 - Affidavit of Michael Nathanson)(Bowers, Sarah) Modified on 9/6/2017 to add restriction level to Exhibit 1 (APD). Modified on 9/12/2017 (SWM). (Entered: 09/05/2017) |
| 09/05/2017 | 51 | EXHIBIT re 50 MOTION for Summary Judgment *Redacted Exhibit 1 - Barbera Deposition Transcript Excerpts* by PEARSON EDUCATION, INC.. |

| | | |
|---|---|---|
| | | (Bowers, Sarah) (Entered: 09/05/2017) |
| 09/05/2017 | 52 | BRIEF/MEMORANDUM in Support re 50 MOTION for Summary Judgment , filed by Defendant PEARSON EDUCATION, INC.. (Bowers, Sarah) (Entered: 09/05/2017) |
| 09/08/2017 | 53 | Unopposed MOTION to Seal Document 50 MOTION for Summary Judgment *To Maintain Docket No. 50-1 Under Seal*, filed by Defendant PEARSON EDUCATION, INC.. (Attachments: # 1 Text of Proposed Order)(Bowers, Sarah) (Entered: 09/08/2017) |
| 09/08/2017 | 54 | BRIEF/MEMORANDUM in Support re 53 Unopposed MOTION to Seal Document 50 MOTION for Summary Judgment *To Maintain Docket No. 50-1 Under Seal* , filed by Defendant PEARSON EDUCATION, INC.. (Bowers, Sarah) (Entered: 09/08/2017) |
| 09/11/2017 | 55 | ORDER granting Defendant's 53 Motion to Maintain Document 51-1 Under Seal. Signed by Magistrate Judge Debra McVicker Lynch on 9/11/2017. (SWM) (Entered: 09/12/2017) |
| 09/14/2017 | 56 | Appendix of Exhibits in Support of Response in Opposition to Motion re 48 MOTION for Sanctions *Against Defendant for Spoliation of Evidence* , filed by Defendant PEARSON EDUCATION, INC.. (Attachments: # 1 Exhibit 1 - February 23, 2016 Letter from Plaintiff's Counsel enclosing EEOC Charge, # 2 Exhibit 2 - Excerpts from Plaintiff Vicki Barbera's Deposition, # 3 Exhibit 3 - June 26, 2017 Letter from Plaintiff's Counsel, # 4 Exhibit 4 - July 5, 2017 Letter from Defendant's Counsel)(Springer, Cynthia) (Entered: 09/14/2017) |
| 09/14/2017 | 57 | RESPONSE in Opposition re 48 MOTION for Sanctions *Against Defendant for Spoliation of Evidence* , filed by Defendant PEARSON EDUCATION, INC.. (Springer, Cynthia) (Entered: 09/14/2017) |
| 09/21/2017 | 58 | REPLY in Support of Motion re 48 MOTION for Sanctions *Against Defendant for Spoliation of Evidence* , filed by Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 09/21/2017) |
| 10/03/2017 | 59 | Designation of Evidence re 50 MOTION for Summary Judgment *in Opposition to Defendant's Motion for Summary Judgment*, filed by Plaintiff VICKI BARBERA. (Attachments: # 1 Exhibit A - Deposition Transcript of Vicki Barbera (Excerpts Only), # 2 Exhibit B - Vicki Barbera Deposition Transcript Errata Sheet)(DeLaney, Kathleen) (Entered: 10/03/2017) |
| 10/03/2017 | 60 | RESPONSE in Opposition re 50 MOTION for Summary Judgment , filed by Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 10/03/2017) |
| 10/17/2017 | 61 | REPLY in Support of Motion re 50 MOTION for Summary Judgment , filed by Defendant PEARSON EDUCATION, INC.. (Springer, Cynthia) (Entered: 10/17/2017) |
| 11/22/2017 | 62 | ORDER granting in part and denying in part 48 Motion for Sanctions as provided in this order. Signed by Magistrate Judge Debra McVicker Lynch on 11/22/2017. (CBU) (Entered: 11/22/2017) |

| 11/27/2017 | 63 | Exhibit List *Plaintiff's Final*, filed by Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 11/27/2017) |
| --- | --- | --- |
| 11/27/2017 | 64 | Witness List *Plaintiff's Final*, filed by Plaintiff VICKI BARBERA. (DeLaney, Kathleen) (Entered: 11/27/2017) |
| 11/27/2017 | 65 | Exhibit List *Final*, filed by Defendant PEARSON EDUCATION, INC., Witness List *Final*, filed by Defendant PEARSON EDUCATION, INC.. (Springer, Cynthia) (Entered: 11/27/2017) |
| 12/04/2017 | 66 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by VICKI BARBERA re 62 Order on Motion for Sanctions (Attachments: # 1 Exhibit A - Confidentiality and Proprietary Property Agreement)(DeLaney, Kathleen) (Entered: 12/04/2017) |
| 12/18/2017 | 67 | Appendix of Exhibits in Support of Response in Opposition to Motion re 66 APPEAL OF MAGISTRATE JUDGE DECISION to District Court by VICKI BARBERA re 62 Order on Motion for Sanctions , filed by Defendant PEARSON EDUCATION, INC.. (Attachments: # 1 Exhibit A - Voluntary Severance Program and Attendance Bonus, # 2 Exhibit B - Plaintiff's Responses and Objections to Defendant's First Requests for Production of Documents)(Springer, Cynthia) (Entered: 12/18/2017) |
| 12/18/2017 | 68 | RESPONSE in Opposition re 66 APPEAL OF MAGISTRATE JUDGE DECISION to District Court by VICKI BARBERA re 62 Order on Motion for Sanctions , filed by Defendant PEARSON EDUCATION, INC.. (Springer, Cynthia) (Entered: 12/18/2017) |
| 12/21/2017 | 69 | REPLY in Support of Motion re 66 APPEAL OF MAGISTRATE JUDGE DECISION to District Court by VICKI BARBERA re 62 Order on Motion for Sanctions , filed by Plaintiff VICKI BARBERA. (Attachments: # 1 Exhibit 1 - Defendant's Response to Plaintiff's First Requests for Admission, Nos. 11 and 12, # 2 Exhibit 2 - Defendant's Responses to Plaintiff's First Request for Production of Documents No. 11)(DeLaney, Kathleen) (Entered: 12/21/2017) |
| 12/28/2017 | 70 | ORDER - Plaintiff Vicki Barbera, who is female, worked for Defendant Pearson Education, Inc. ("Pearson"), an education publishing company, for 27 years. During her tenure, Ms. Barbera worked in a variety of roles, most recently as a Manager of Business Analysis. In January 2016, Pearson announced that 700 warehouse employees - including Ms. Barbera - would no longer be employed by Pearson but would, instead, be employed by R.R. Donnelley & Sons Company ("R.R. Donnelley"). After Ms. Barbera declined to accept a job offer from R.R. Donnelley, she brought this lawsuit against Pearson alleging sex discrimination and a violation of the Equal Pay Act. Pearson moved for summary judgment, [Filing No. 50 ], and that motion is now ripe for the Court's review. In addition, Ms. Barbera filed an Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, [Filing No. 66 ], which the Court will also consider herein. For the reasons stated in this Order, the Court OVERRULES Ms. Barbera's Objection to the Magistrate Judge's Order on Plaintiff's Motion for Sanctions, 66 , and GRANTS Pearson's Motion for Summary Judgment, 50 . Final judgment shall enter accordingly. (See |

| | | Order). Signed by Judge Jane Magnus-Stinson on 12/28/2017. (APD) (Entered: 12/28/2017) |
| 12/28/2017 | 71 | FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 58 - For the reasons set forth in the Court's Order entered on December 28, 2017, the Court now enters FINAL JUDGMENT against Plaintiff and in favor of Defendant, such that Plaintiff shall take nothing by way of her Complaint. Signed by Judge Jane Magnus-Stinson on 12/28/2017.(APD) (Entered: 12/28/2017) |
| 01/10/2018 | 72 | NOTICE OF APPEAL as to 70 Order on Motion for Summary JudgmentOrder on Appeal of Magistrate Judge Decision to District Court, 71 Closed Judgment, filed by Plaintiff VICKI BARBERA. (Filing fee $505, receipt number 0756-4703641) (DeLaney, Kathleen) (Entered: 01/10/2018) |

**Case #: 1:16-cv-02533-JMS-DML**